UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
Y.N. and Sh.N., individually and on behalf of S.N.,

                  *Plaintiffs,*

   -against-                               17-cv-04356 (KMK)

Board of Education of the Harrison Central
School District,

                  *Defendant.*
_____

**MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

DATED: September 18, 2017          LAW OFFICES OF REGINA SKYER
                                 & ASSOCIATES, LLP

                                 Diana Gersten, Esq.
                                 Linda A. Goldman, Esq.
                                 276 Fifth Ave.
                                 New York, NY 10001
                                 (212) 532-9736
                                 dgersten@skyerlaw.com

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND …………………………. 2

THE IMPARTIAL HEARING …………………………………………………. 6

THE IHO'S DECISION ……………………………………………………. 12

THE SRO'S DECISION …………………………………………………. 13

LEGAL FRAMEWORK.................................................................. 14

STANDARD OF REVIEW ................................................................ 15

ARGUMENT.................................................................................. 16

   I.    THE DISTRICT FAILED TO PROVIDE S.N. WITH
      A FAPE FOR THE 2015-2016 SCHOOL YEAR ................................... 16

      A.  The August IEP Was Based Upon Inaccurate
         Test Scores and Was Invalid ………………………………… 19

      B.  The District's Failure to Conduct a Classroom Observation
         and Assess S.N.'s Functional Abilities in a Classroom
         Implicated Substantive Rights……………………………… 22

      C.  The August IEP Was Substantively Insufficient …………… 23

  II.    DEFERENCE TO THE IHO'S PRONG II AND PRONG III
      FINDINGS IS WARRANTED ……………………………………. 25

CONCLUSION.................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Bd. Of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,*
  458 U.S. 176 (1982) ……………………………………………………………     14-15
*C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68 (2d Cir. 2014) ………     25
*D.C. ex rel. E.B. v. New York City Dep't of Educ.,* 950 F. Supp. 2d 494
  (S.D.N.Y. March 26, 2013)……………………………………………………     21
*D.M. v. City School District of the City of New York,* 2016 WL 319859
  (S.D.N.Y. Jan. 26, 2016) ……………………………………………………     17
*D.N. v. Board of Education of Center Moriches Union Free School District,*
  2015 WL 5822226 (E.D.N.Y. September 28, 2015) ……………………………     21
*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, __ U.S. __,*
  137 S. Ct. 988 (2017) ………………………………………………………......     14
*E.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 442-44
  (S.D.N.Y. 2010), *aff'd,* 487 Fed. Appx. 619 (2d Cir. 2012) …………………………     16
*Florence County Sch. Dist. Four et al. v. Carter by Carter*, 510 U.S. 7 (1993) ………     15
*Forest Grove School Dist. v. T.A.*, 557 U.S.230, 252 (2009) …………………………     15
*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105 (2d Cir. 2007) .....................     14-15, 25
*G.R. v. New York City Dep't of Educ.,* 2012 WL 310947
  (S.D.N.Y., January 31, 2012) …………………………………………………     16
*M.H v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125 (S.D.N.Y. 2010),
  *aff'd,* 685 F.3d 217 (2d Cir. 2012) …………………………………………………     15, 25
*R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012) ………………     17, 20-23
*Reyes v. New York City Dep't of Educ.*, 760 F.3d 211 (2d Cir. 2014) ………………     19
*Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985)............     15
*S.Y. & R.Y. v. NYC DOE*, 210 F. Supp.3d 556 (S.D.N.Y. 2016) …..............................     17
*W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 2017 WL 3066888
  (S.D.N.Y. July 18, 2017) …………………………………………………………     16
*W.M. v. Lakeland Cent. Sch. Distr.*, 783 F. Supp. 2d 497 (S.D.N.Y. 2011) ..................     15
*Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119 (2d Cir. 1998) ............................     14

**Statutes**

20 U.S.C. § 1414 (d)(1)](A)(i) .......................................................................     19
20 U.S.C. § 1414(d)(2)(A) …………………………………………………………     19
N.Y. Educ. Law § 4403[a] .................................................................................     1

## Regulations

34 CFR § 300.301 ……………………………………………………………… 22
34 CFR §300.308[a] …………………………………………………………… 22
34 CFR §300.310 ……………………………………………………………… 22
34 CFR § 300.320(a)(1) ................................................................................. 19
34 C.F.R. § 300.323(a) ……………………………………………………….. 19


8 NYCRR § 200.4[a] ................................................................................... 22
8 NYCRR § 200.4[b] ……….…................................................................... 22
8 NYCRR § 200.4[b][5] ………………………………………………………. 22
8 NYCRR § 200.4[b][6] ............................................................................. 19
8 NYCRR 200.4(b)(6)(i)(b), (c) ………………………………………………. 19
8 NYCRR § 200.4[d][2][i]) ……………………………………………………. 22
8 NYCRR § 200.4[j][1], [2] ....................................................................... 22
8 NYCRR 200.4[j][1][i] ………………………………………………………. 22

## Administrative Decisions

*Application of a Student Suspected of Having A Disability*, Appeal No. 15-038) …… 22

.

Plaintiffs-Appellants Y.N. and Sh. N., individually and on behalf of their daughter S.N., respectfully submit this memorandum of law in support of their motion for summary judgment seeking review of the determination of a State Review Officer ("SRO"), pursuant to N.Y. Education Law § 4404(3)(a). For the reasons stated below, this Court should reverse the March 24, 2017 decision of the SRO, reinstate the decision of the Impartial Hearing Officer ("IHO") and order Defendant-Appellee, the Board of Education of the Harrison Central School District (the "District"), to reimburse S.N.'s parents for the costs of placing her at the Windward School for the 2015-2016 academic year.

## INTRODUCTION

This appeal centers around the actions of the District in failing to offer its student an educational program that was specifically calculated to meet her educational needs. One of the primary reasons for this failure lies in the decision of the District to wait while an entire school year elapsed before responding to the parents' request that their daughter be evaluated and placed in a special education program. There was no legitimate reason for the District to have waited so long and to have rushed through the evaluative process, giving itself little more than a day or two to complete the reports that it intended to rely on in formulating its program recommendation. Moreover, as a function of its decision to delay consideration of the parents' referral, the District never observed the student in a classroom environment nor did it make any attempt to contact the student's current school or speak to her teachers to ascertain her true functional abilities in a classroom. Moreover, due to the unnecessarily rushed nature of the process, the District created and relied upon an invalid neuropsychological evaluation that contained erroneous testing scores.

Following a due process hearing, the Impartial Hearing Officer ("IHO") determined, *inter alia*, that the District lacked necessary information regarding the student's ability to succeed in a

mainstream environment and that it failed to offer her a free and appropriate public education ("FAPE") for the school year in question. The SRO subsequently overturned this finding and concluded that the District possessed adequate evaluative information and had developed a program that was reasonably calculated to address the student's needs. The parents now appeal.

### Factual and Procedural Background

The student in question, S.N., was born on December 16, 2005, is currently 11 years old and is a resident of the town of Harrison, Westchester County. She began her early education at the Solomon Schechter School in White Plains and, while there, it became increasingly evident that S.N. was falling behind and becoming unable to keep pace with her general education peers (Tr. 1012-1013).[1] As a result, the district of location, the White Plains Central School District, created an Individualized Education Service Plan ("IESP") after recognizing that S.N. needed to improve her decoding skills, reading comprehension skills, writing and math skills (Ex. L-4). S.N. did not receive any services from White Plains, but received individual and group pull-out services from Solomon Schechter (Tr. 1071).[2]  Despite these interventions, S.N. still experienced academic difficulties, which negatively affected her self-esteem and resulted in increased anxiety (Tr. 1016). In late Spring of 2014, SN.'s parents, recognizing that their daughter could no longer stay at Solomon Schechter, reached out to Harrison, their district of residence, seeking an IEP for their daughter. Harrison responded that it would not develop an IEP until S.N. was formally enrolled in the District (Ex. 1-00002).[3]

---

[1] References to Parents' Exhibits are indicated by the Exhibit letter followed by the page number within the exhibit. References to District Exhibits are indicated by the Exhibit number followed by the respective Bates stamped page number. References to the transcript of the Impartial Hearing appear as ("Tr") followed by the page number. Citations to the IHO and SRO decision appear as ("IHO Dec.") and ("SRO Dec.") followed by the page number.
[2] Testimony elicited at the Impartial hearing revealed that S.N. had received private reading support twice a week as well as other special education support services in school (Tr. 772, 1071).
[3] This response prompted IHO John Farago to issue an interim order for the 2014-15 school year, declaring that once a school district is on notice that a family residing in the district is seeking special education placement or services, the district is then required to evaluate and offer an appropriate placement to the student (Ex. K-4).

S.N. was unilaterally placed at the Windward School, an independent special education day school, for the 2014/15 academic year. The dispute between the parties regarding this school year was eventually resolved by stipulation of settlement requiring the District to reimburse the parents for the tuition costs at Windward (Ex. 35-00178). The parents, in turn, discontinued all claims against the District emanating from violations of its legal obligations with respect to the 2014/15 school year (*Id.*). The parents, however, expressly reserved the right to pursue any and all claims regarding the 2015/16 school year (Ex. 35-00182, ¶ 11).

Shortly before starting Windward, S.N. was independently evaluated by Dr. Laura Tagliareni, who determined that S.N. manifested clear weakness in her verbal skills, language processing, comprehension skills and processing speed (Ex. 13). Dr. Tagliareni diagnosed S.N. with a severe language based learning disorder and indicated that she met the criteria for Dyslexia, a Specific Learning Disorder in Reading, with impairment in comprehension (severe), and a Specific Learning Disorder in Mathematics, with impairment in memorization of arithmetic facts and fluent calculation (moderate) as well as ADHD, Combined Presentation (Ex. 13-00094-95). Progress reports from Windward for 2014/15 confirmed that S.N. experienced difficulties comprehending material but that she was making progress in terms of decoding more accurately and reading with better fluency (Ex.17-00131).

To facilitate District action in connection with the 2015/16 school year, S.N.'s mother completed and submitted registration materials on May 11, 2015 (Ex. J-5; Tr. 1033). She also filled out authorization forms for release of student records on May 29, 2015 (Ex. 20-00149). On June 4, 2015, S.N.'s mother, through her attorney, reiterated to the CSE that she was seeking a FAPE for S.N. for the 2015/16 school year and that she had filled out all the registration forms (Ex. F-1). Despite oral and written notice, the District did not take affirmative action regarding

3

the provision of a FAPE for the 2015/16 school year until June 22, 2015, when it notified S.N.'s parents regarding evaluations it was seeking to conduct and asked for their consent (Exs. 22, 23).

On June 23, 2015, S.N. underwent a District educational evaluation in which she performed in the below average range (12th percentile) in reading comprehension, below average (10th percentile) in nonsense decoding words and below average range (9th percentile) in decoding fluency. The following day, S.N. participated in psychological testing conducted by Dr. Rebecca Greenwell (Ex. M). Dr. Greenwell recorded the wrong date of birth for S.N., which invalidated her test scores (*Compare* Ex. M-1 with Ex. 15-00110; Tr. 269). The erroneous report was used at S.N.'s August 2015/16 IEP meeting and the assessments were not re-scored or corrected until after the 2015/16 school year had begun (Ex. 18-0013; Tr. 270). Three different versions of Dr. Greenwell's evaluation were admitted into evidence (Ex. M, Ex. 15; Ex. 18).

On the same day as Dr. Greenwell's evaluation, S.N. also submitted to a speech and language evaluation by Claire Zucker (Ex. 16-00117-00120), who found that S.N.'s scores were in the average range but that she demonstrated delayed responses and had to be accommodated with more than one repetition. As the directions became increasingly longer, S.N.'s reaction time slowed. S.N. missed both literal and inference questions in comprehension related tasks; she demonstrated confusion on initial directions; and she requested that information be repeated. S.N. struggled to apply information that she was given (Ex. 16).

On August 4, 2015, the District convened to develop an IEP for S.N. for the 2015/16 school year. The CSE ultimately classified S.N. with a Learning Disability and determined that a general education classroom with resource room and consultant teaching services was warranted (Ex. 4-00032).  S.N.'s mother believed that the District's program recommendation was insufficient due to the nature and extent of S.N.'s deficits and she expressed this opinion to the

team (Ex. 4-00025; Tr. 186, 1037). Critically, the IEP team used, as a basis for its recommendation, the invalid psychoeducational evaluation prepared by Dr. Greenwell, which contained wrong scores (Tr. 77-78, 108, 169, 265- 270, 275, 304, 320). S.N.'s mother pointed out this error to the CSE at the August IEP meeting (Tr. 265, 268), however, the scores were not corrected until after the 2015/16 academic year had already commenced (Tr. 326, 331). On October 14, 2015, the District conducted a classroom observation of S.N. at Windward, however, this observation also occurred after the 2015/16 school year had commenced (Ex. 19-00147)

The District conducted a second IEP meeting on November 23, 2015 for the express purpose of "review[ing] the classroom observation and the revised psychological evaluation" (Ex. 5-00036). This IEP meeting resulted in a determination that S.N. required a more restrictive program than initially recommended.

On January 28, 2016, the parents filed an Impartial Hearing Request reiterating their claims regarding the inappropriateness of the August IEP program recommendation; the absence of a classroom observation; the mischaracterization in the August IEP of the extent and severity of S.N.'s disability; the inadequacy of the August IEP goals; and the inaccuracies in the scores utilized by the August IEP team (Ex.1-00001-00006). The District replied that "[t]here was no evidence suggesting that [S.N.] needed a full day special education program" and that it was impossible to conduct a classroom observation because S.N.'s school was closed (Ex. 2-00008). With reference to the invalid test scores utilized by the August IEP team, the District maintained that because retroactive input of the correct birthdate purportedly resulted in higher scores, the August IEP should be deemed valid (Ex. 2-00010). The District, however, made no mention of the fact that neither the parents, nor the District, had any knowledge as to whether S.N.'s scores

would be higher or lower, nor what the implications of the rescoring would be, until those scores were actually corrected, which was after the commencement of the 2015/16 school year.

### The Impartial Hearing

District witness Julie Snider testified that she believed that the District was not required to evaluate S.N. for the 2015/16 academic year until the negotiations regarding the prior 2014/15 school year resulted in a stipulation or settlement agreement (Tr. 60-61, 66). She stated:

> My understanding was that there was talks between the school district attorney and [parents' counsel], so there was discussion and **until the agreement was signed that we were not going to take any action**. I wasn't employed by the district at this time but that was my understanding" (emphasis added) (Tr. 151).

Ms. Snider was, however, aware that S.N.'s mother had been requesting special education services for S.N. and had filled out a special services survey in the middle of May, 2015. Nevertheless, the District elected to wait until June 22, 2015 to commence the evaluation process (Tr. 73, 159), giving itself only two or so days to complete all testing and prepare the evaluative reports (Tr. 74; Ex. E-3). Ms. Snider stated that Harrison was unable to conduct a classroom observation and was unable to speak with S.M.'s teachers because there was a small "window" of time within which to evaluate S.N. (Tr. 84) and Windward was "closed" as of June 11th (Tr. 84, 162, 207, 216).[4] She testified that Windward's closure prevented the CSE from conducting an observation and that one would be conducted once school resumed (Tr. 106).

Ms. Snider admitted that the scores that were considered at the August meeting were incorrect (Tr. 77-78, 108, 169) and that the correct version of the evaluation was not issued until October 7, 2015 (Tr. 111; see Ex. M; Ex.15; Ex. 18). Ms. Snider invited Windward to participate

---

[4] With respect to Windward's purported closure during summer recess, Ms. Snider admitted, during cross-examination, that she was not sure whether Windward actually had a summer school program and that she based her decision not to contact Windward prior to the August IEP meeting on her "past experience" that Windward "is not available over the summer" (Tr. 162). Documentary evidence submitted by the parents establishes that Windward did, in fact, have a summer school program commencing July 5, 2015 (Ex. X-15-16).

at the second IEP meeting in November (Tr. 214) pursuant to the standard practice of her office "to contact Windward to alert them of a CSE meeting and ask for their participation in the meeting" (Tr. 215). Windward staff participated by telephone during this second meeting and discussed S.N.'s present levels of performance (Tr. 114). The CSE then decided that their August program recommendation was insufficient and that S.N. needed more special education support, whereupon it recommended an Integrated Co-Teaching ("ICT") classroom (Tr. 115).[5]

Notwithstanding the independent neuropsychologist's findings that S.N.'s disability was severe, Ms. Snider testified that it was "mild," because she thought S.N.'s strengths outweighed her weaknesses (Tr. 172-173). She explained that her use of the term "mild" had no clinical or "technical" significance; that she was just using it as a descriptive adjective; and that she was not using the term based on any testing criteria or standardized norms (Tr. 172-173). At the time of the August IEP meeting, Ms. Snider had never met or observed S.N., she never spoke with S.N.'s neuropsychologist or teachers; and she had not reviewed any prior classroom observations that had been conducted (Tr. 170, 174, 176). She, nevertheless, believed that the August IEP recommendation was appropriate on the basis of S.N.'s test scores (Tr. 210).

The District's school psychologist, Dr. Rebecca Greenwell, reviewed S.N.'s prior evaluations, which revealed that S.N.'s ability to demonstrate her knowledge would vary based upon her attention level and concentration during assessments (Tr. 277). Dr. Greenwell indicated that S.N.'s ability to focus decreased as time went on and that S.N. sometimes appeared to be internally distracted (Tr. 285). Dr. Greenwell agreed with prior evaluations that S.N. demonstrated significant variability in her cognitive skills and that her full-scale IQ scores was not a valid measure of her true abilities because of the variability in her profile (Tr. 289, 292).

---

[5] An ICT classroom consists of general education students as well as students who have been issued IEPs and is taught by both a general education and special education teacher.

Dr. Greenwell testified that the District felt that an ICT or any small classroom placement would be too restrictive (Tr. 297). The CSE formulated this opinion based upon Windward report cards, which indicated that when S.N. is provided with strategies and given explicit instructions, she is able to use and apply those strategies (Tr. 298-300). The strategies that Dr. Greenwell was referring to were, however, given to S.N. in the small, immersive, specialized setting at Windward and there was no evidence presented by the District as to S.N.'s ability to generalize her skills, apply new strategies, understand explicit instructions or make meaningful progress in a large general education classroom. Thus, the August IEP team's consideration of S.N.'s Windward report cards, in relation to her needs, abilities and present levels of performance, should have been analyzed in the context of her being in a highly-specialized school, with a grading rubric that is not necessarily equivalent to that used in a general education classroom.

Claire Zucker, a District speech-language pathologist, indicated that she did not have much time to complete her evaluation, but did not feel that any speech-language services were warranted (Tr. 404). Ms. Zucker admitted that she never spoke to anyone at Windward because she was asked to evaluate S.N. on the last day of school (Tr. 433). She indicated that a mainstream classroom in Harrison typically had 21 to 23 students, with one general education teacher and that at least 80 students ate lunch together (Tr. 445-446). Ms. Zucker also indicated that she had never observed S.N. in anything other than a 1:1 setting (Tr. 464-466).

Rosita McNamara, a District special education teacher, performed S.N.'s evaluation quickly because there was only one day left before school closed (Tr. 503, 567). The evaluation was the first and only time that she met S.N. (Tr. 507, 566) and she did not call the Windward School for any input (Tr. 568, 639). She indicated that S.N. gave up easily and lacked confidence in her skills (Tr. 508, 524). S.N. also had difficulties understanding some of the language used in

math problem-based questions and scored below average in reading comprehension and several reading and decoding subtests (Tr. 511-12, 518, 596-597).

Ms. McNamara recognized that certain needs "[don't] always show up on a test score, it's not always something measurable on a test score" (Tr. 538). She also testified that the CSE used incorrect data when it developed the August IEP (Tr. 590) and acknowledged "[i]f you put in the wrong birthdate, I would imagine that the scores would be different" (Tr. 591). Ms. McNamara wrongly assumed that the data presented at the August meeting had been "right" (Tr. 592).[6]

Debra Saffos, a District speech/language evaluator, observed S.N. at Windward in October, 2015 (Tr. 677, 687, 701; Ex. 19), in a special education classroom consisting of only 10 students.[7] As part of her classroom observation, Ms. Saffos spoke directly with S.N.'s teachers to gage her present levels of performance (Tr. 693). Ms. Saffos rated S.N. as "below expected grade level" in reading, after having observed S.N.'s difficulties with fluency (Ex. 19-00147-00148).

Parents' witness, Dr. Laura Tagliareni, conducted a comprehensive neuropsychological evaluation of S.N. in August of 2014 (Tr. 753, 755; Ex. 13). S.N. presented as a sweet, socially engaged child, however, she was hyperactive; had a hard time focusing; was highly self-conscious; showed a lot of anxiety; had low frustration tolerance; and made many self-negating statements (Tr. 759-760, 766). Her language weaknesses were evident and she had a hard time with processing and recall (*Id*). S.N. presented with clear deficits in reading skills. Her phonics and decoding were below a first-grade level, in one area as low as the 4th percentile (Tr. 761,

---

[6] At the November IEP meeting, the team altered S.N.'s goals and changed the recommendation to an ICT class. Ms. McNamara testified that such a change was warranted "[b]ased on the goals, it warranted to be done in a co-teach classroom. **I couldn't accomplish all of this in just a resource room and a consultant teacher model**" (Tr. 563); (emphasis added).

[7] The District also called Laura Fahey, a fourth-grade general education teacher, as a witness. She testified that in contrast to the small specialized classrooms at Windward, there were 24 students in the type of classroom that the District had proposed for S.N. (Tr. 663) and that the students' present levels of performance and abilities would not have been assessed until after the school year started (Tr. 676).

969). Her reading comprehension was poor as was her fluency (*Id.*). Her ability to formulate a very brief essay was below average and there was also a lot of variability in her math skill set because her math fluency was poor and she had not yet mastered math automaticity (Tr. 762). S.N. was diagnosed as meeting the criteria for dyslexia; she also had a severe language-based learning disorder (Tr. 762-763, 767); and showed signs of anxiety (Tr. 766). Dr. Tagliareni used the clinical term "severe," as defined in the Diagnostic and Statistical Manual, to describe S.N.'s learning impairments (Tr. 764). S.N. also met the criteria for ADHD, exhibiting distractibility and hyperactivity both clinically and in testing (Tr. 765, 890-92, 906).

Dr. Tagliareni indicated that S.N. required a full-time language-based special education school, with a small student to teacher ratio, to address her severe learning disability and resulting anxiety (Tr. 767-768). She also testified that S.N. would be unable to keep pace in a general education setting and that it was critical for S.N.'s learning and her social-emotional functioning to be placed in a school for students with similar learning disabilities (Tr.808, 886, 961). Dr. Tagliareni testified that contrary to the beliefs of District witnesses, there was "nothing mild about S.N.'s disability" (Tr. 771-77). Rather, her dyslexia was "quite severe" even though

> …she had already received private Orton-Gillingham twice a week from December until [the following August] plus she had supports at school and accommodations at school…With all those things, with all the services and her continued deficits, that's not a mild disability…Again, her decoding was so poor, her fluency was so poor, she wasn't reading well at all. So neurologically there is a window of time. She literally had to catch up thousands of words while her peers were already versed in those words, she had a lot of makeup to do but thousands is accurate. And environmentally, so in third grade she doesn't have time to look at a word and try to figure out what it is and not understand what she is reading" (Tr. 772-773).

Dr. Tagliareni testified that no one from Harrison called her to discuss her evaluation before the August IEP meeting (Tr. 771) and that the District had used an outdated Woodcock-Johnson III Test of Cognitive Abilities in evaluating S.N. (Tr. 778). With respect to the August

team's reliance on incorrect psychoeducational scores, Dr. Tagliareni testified that the error was **statistically significant** and affected the analysis of S.N.'s needs and deficits in a way that was far more profound than the District has suggested (Tr. 782). Indeed, she specifically noted that the erroneous report, making S.N. one year older, "described a very different child in terms of cognitive potential and intellectual functioning" (*Id.*). She explained that S.N.'s overall I.Q. was actually higher than initially reported thereby making the discrepancy in her low average academic scores even greater. Thus, the CSE's reliance on incorrect data resulted in a program recommendation that did not take into account the larger discrepancies in scores that were revealed when the corrected birthdate was used, "which is pretty important" (Tr. 783-84).

Dr. Tagliareni also pointed out the importance of conducting a classroom observation and speaking with a student's current teachers because "children can present very differently in a 1:1 setting," and the way in which they function in a classroom depends on factors including the size of the class, the nature of the class and the composition of the students (Tr. 789, 931, 942, 945). Although Windward offers highly specialized instruction, S.N.'s needs required that she be placed in Windward's lower reading and math groups, along with students of the same level (Tr. 797, 802) and while she is making academic progress, she still exhibits challenges with respect to phonics, decoding and reading fluency (Tr. 802, 806-807).

S.N.'s mother ("Sh.N.") testified regarding her daughter's educational history and what led her to contact the District to obtain an IEP for S.N. (Tr. 1012-1023, 1069-1073). Sh.N. filled out the registration packet that the District demanded and she brought it to the District on May 11, 2015 (Tr. 1031, 1137), along with the special services survey, but never heard back from the District until the end of June, 2015 (Tr. 1034). She attended the August IEP meeting and informed the District that she believed the recommendation was insufficient; that her daughter

needed a smaller classroom setting; and that her daughter had a more severe disability than the District was suggesting (Tr. 1037-1038, 1099-1106, 1140). The District did not try to contact Windward for the August meeting nor did it ask her to contact Windward, which she would have been able to do (Tr. 1039). Sh.N. did not believe that the August IEP was accurate because it was based on an evaluation that had an incorrect date of birth and the test results were inaccurate (Tr.1096, 1116). She stated "I was scared that… if we had the wrong birthdate, I know the scores needed to change, but like I just lost a little bit of confidence…" (Tr 1140).

Sh.N. selected Windward as an appropriate setting for her daughter after visiting the school, speaking with other parents, attending informational meetings and reviewing Windward program materials (Ex. X; Tr. 1049-1051). Sh.N. signed a Windward enrollment contract and gave a deposit in order to reserve a spot for S.N. for the 2015/16 school year because she did not have a proper IEP (Tr. 1113, 1143).  She indicated that losing the tuition money would not have stopped her from accepting a proper District program because she wanted her daughter to attend school in the community in which they resided (Tr. 1144). Sh.N. believed, however, that her daughter would have "drowned" in a general education classroom, even with the accommodations and supports proposed in the August IEP (Tr. 1139).

### The IHO's Decision

On January 16, 2017, IHO Sharyn Finkelstein issued a ruling in favor of the parents and awarded them reimbursement for the tuition costs incurred in placing S.N. at Windward for the 2015/16 academic year. Critical to her determination were findings that the August IEP was based on invalid and inaccurate scores, rendering the IEP inappropriate; that the District acted improperly in waiting for a 2014/15 stipulation of settlement to be executed before taking any action with respect to the 2015/16 school year; that there was insufficient evidence before the

August, 2015 IEP team that S.N. could appropriately function and receive educational benefits in a general education setting; that the Windward School was an appropriate educational setting for S.N. and that the equities did not preclude reimbursement (IHO Dec. 20-21). The District subsequently appealed this decision to the State Education Department's Office of State Review.

### The SRO's Decision

By decision dated March 24, 2017, the SRO agreed with the IHO to the extent that she found that the parties 2014/15 settlement agreement did not release the District from its obligation to have provided S.N. with a FAPE for the 2015/16 academic year (SRO Dec. 11). The SRO found that the District's failure to have acted in a timely manner with respect to evaluating S.N. resulted in the absence of participation by Windward staff and that this "contributed to the CSE not having information regarding the student's functional performance" (SRO Dec. 12). Additionally, the SRO concluded that the accuracy of the test scores upon which the District relied had been "compromised" (SRO Dec. 15) and that the District's reliance on the erroneous reports, coupled with its failure to conduct a classroom observation or obtain input from Windward personnel, resulted in a violation of the student's rights (SRO Dec. 12, 17).

Although the IHO cogently reasoned that the foregoing errors operated to deprive S.N. of a FAPE because they affected the validity of the IEP as well as the substantive sufficiency of the District's program recommendation (IHO Dec. 21), the SRO disagreed and described the errors as merely "procedural" (SRO Dec. 12, 17). The SRO then concluded that they did not affect the appropriateness of the District's recommendation or deny S.N. a FAPE (SRO Dec. 22).

In reaching this decision, the SRO failed to take into account governing law regarding the obligation of a school district to provide a valid IEP as of the first day of the school year as well as Second Circuit precedent that prohibits subsequent modifications to rectify a defective IEP.

Additionally, the SRO mischaracterized the findings of the IHO and made unfair assumptions about S.N.'s ability to function in a large general education environment, notwithstanding the absence of evidence from the District regarding this important issue. The SRO's decision is also internally inconsistent to the extent that she concluded that the CSE did not have information regarding the student's functional performance due to the absence of participation by Windward staff (SRO Dec. 12), but later concluded that the CSE "was in possession of adequate evaluative information regarding the student's functional performance" (SRO Dec. 22). The SRO's decision is also problematic in terms of its reliance upon documents that the District itself described as "vague and unreliable" (SRO Dec. 8) and its failure to recognize that the preponderance of evidence documented S.N.'s need for full-time, immersive special education support. For these reasons, the SRO's decision should not be given deference and the more persuasive, well-reasoned findings of the IHO should be adopted by this Court.

## LEGAL FRAMEWORK

The Individuals with Disabilities Education Improvement Act ("IDEA") requires that states provide "all children with disabilities a free and appropriate public education." *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 107 (2d Cir. 2007) (internal citation omitted). This obligates the DOE to provide "special education and related services tailored to meet the unique needs of a particular child …. and be reasonably calculated to enable the child to receive educational benefits." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998); *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, __ U.S. __, 137 S. Ct. 988 (2017).

A FAPE is offered only when (a) the board of education complies with the procedural requirements of the IDEA; and (b) the IEP developed through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits. *See Bd. Of Educ. of*

the *Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 205 (1982). "[W]hen a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the independent education" *Forest Grove School Dist. v. T.A.*, 557 U.S.230, 252 (2009). To determine whether parents are entitled to tuition reimbursement, courts employ the three-prong *Burlington/Carter* test: (I) whether the public school placement that had been offered to the child was an appropriate placement under the terms of the IDEA; (II) whether the independent school placement chosen by the parents was an appropriate placement under the IDEA; and (III) whether a balancing of equitable considerations favors reimbursement. *See Sch. Comm. of the Town of Burlington v. Dep't of Educ.,* 471 U.S. 359 (1985); *Florence County Sch. Dist. Four et al. v. Carter by Carter*, 510 U.S. 7 (1993).

## STANDARD OF REVIEW

When reviewing a challenge to an administrative decision made pursuant to the IDEA, the District Court "conducts an 'independent review of the administrative record' and then makes a determination based on a 'preponderance of the evidence.'" *W.M. v. Lakeland Cent. Sch. Distr.*, 783 F. Supp. 2d 497, 504 (S.D.N.Y. 2011); *citing Gagliardo*, (489 F.3d at112). Inquiry into the validity of the findings of a state educational administrative agency "*require[s]* a court not only to satisfy itself that the State has adopted the state plan, policies and assurances required by the [IDEA], but also to determine that the State has created an IEP for the child in question which conforms with the requirements of [the Act]." *Id.*, n.27

In conjunction with these standards, the Second Circuit has recognized that judicial deference to an SRO's opinion is not warranted with respect to questions of law, over which an SRO has no greater expertise. *See M.H v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125 (S.D.N.Y.

2010), *aff'd,* 685 F.3d 217 (2d Cir. 2012); *see also W.A. v. Hendrick Hudson Cent. Sch. Dist.,* 2017 WL 3066888 (S.D.N.Y. July 18, 2017). Courts have also reversed an SRO's decision where it "fail[ed] to take into account important information" *see G.R. v. New York City Dep't of Educ.,* 2012 WL 310947 (S.D.N.Y., January 31, 2012); *E.S. v. Katonah-Lewisboro Sch. Dist.,* 742 F. Supp. 2d 417, 442-44 (S.D.N.Y. 2010), *aff'd,* 487 Fed. Appx. 619 (2d Cir. 2012), when the decision was insufficiently reasoned to merit deference or when an SRO rejects a more thorough and carefully considered decision of an IHO. Under such circumstances, courts have held that it is appropriate to, instead, defer to the IHO's better-reasoned and more sound analysis.

It is respectfully submitted that the preponderance of evidence in the record supports the findings of the IHO, rather than the SRO. Review of the legal issues likewise reveals that the SRO's analysis was flawed and that she improperly excused IDEA violations, which affected S.N.'s **substantive** right to a FAPE, by declaring those violations to be purely procedural in nature. The SRO did not cohesively analyze the impact that these violations had. Instead, she selectively marshalled the evidence, whether considered by the CSE or not, in a belabored effort to justify the IEP.  Accordingly, deference to the SRO's decision is not warranted in this case.

## <u>ARGUMENT</u>

### I.   <u>THE DISTRICT FAILED TO PROVIDE S.N. WITH A FAPE FOR THE 2015-2016 SCHOOL YEAR</u>

The instant dispute involves the legitimacy and appropriateness of an IEP that was developed, at the very last minute, because the District decided to await the results of a settlement agreement for an entirely distinct year. This decision left the CSE team with evaluative reports that contained mistakes, including an entire set of erroneous scores. It also resulted in the failure to have ever ascertained from the student's current school what her functional abilities were in a classroom, outside of the 1:1 clinical setting in which the District

evaluated the child. Given the absence of a valid psychoeducational report from the District, the independent neuropsychological evaluation conducted by Dr. Tagliareni was of critical importance to an accurate assessment of S.N.'s needs and abilities. The District, however, disregarded the recommendations contained in Dr. Tagliareni's report even though there was no other recent, accurate psychological report to inform a decision as to whether a general education setting was appropriate for S.N. (*see D.M. v. City School District of the City of New York*, 2016 WL 319859 (S.D.N.Y. January 26, 2016). The IHO recognized this fact and found that an observation of S.N. at school and a discussion with her current teachers was essential to understanding how S.N. functions in a classroom and whether she would be able to make educational progress if her placement was changed from a full-time special education setting to a general education classroom. The SRO, for the most part, improperly engaged in post-hoc rationalizations to justify the District's program recommendation (s*ee S.Y. v. New York City Dep't of Educ.*, 210 F.Supp.3d 556 (S.D.N.Y. 2016). The SRO endorsed the CSE's conclusory description of any information that differed from its findings as being "discrepant" (SRO Dec. 12, 18) and the SRO also went so far as to suggest that the CSE's decision to offer S.N. a more restrictive program in November was unrelated to the level of need she exhibited just months before in August (*Id.*). In fact, as the IHO astutely recognized, the change in the CSE's program proposal had nothing to do with any actual change in S.N.'s needs, but rather, as several District witnesses conceded, had to do with the fact that the CSE (belatedly) obtained necessary information from Windward regarding the extent of those needs (IHO Dec. 21).

In addition to the forgoing, the SRO, in violation of the proscription against the use of retrospective testimony (*see R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 [2nd Cir. 2012]), compared S.N.'s scores from the District's original psychoeducational evaluation with the

corrected scores she received after the commencement of the school year (SRO Dec. 15). It was, however, legally improper for such a comparison to have factored into the SRO's decision.

The SRO, throughout her decision, also utilized Windward's 2014/15 report cards (which the District described as "vague and unreliable") as a primary means of justifying the CSE's decision to recommend that S.N. be placed in a general education setting (SRO Dec. 12-14, 16-18, 20-21). The SRO, however, failed to account for the fact that S.N.'s progress, as delineated in her report cards, was directly attributable to the rigorous and immersive special education services that S.N. was receiving at Windward. These specialized services, as well as the specialized curriculum at Windward, were not comparable to the general education program proposed by the District and in no way demonstrated that S.N. could make meaningful progress in the setting proposed by the District. Similarly, the issue of exacerbation of S.N.'s anxiety and distractibility in a mainstream setting was also inadequately addressed in the SRO's decision.

The SRO ultimately concluded that this was not a case where the District was careless in formulating the student's IEP or where it acted with indifference to the procedural requirements of the IDEA (SRO Dec. 18). The record, however, is not consistent with this finding and, instead, supports the IHO's conclusion that the CSE's actions did result in an invalid and deficient IEP. Moreover, contrary to the conclusions of the SRO regarding the scope of the instant dispute (SRO Dec. 11, 18), the parents have always maintained that the CSE did not understand the nature and extent of S.N.'s disability; that the CSE erred in failing to ascertain S.N.'s functional limitations (by failing to conduct an observation and speak with Windward staff); and that such failure specifically harmed S.N. by resulting in a substantively deficient program recommendation (Ex. 1-00003). Thus, the SRO's should have analyzed these claims in terms of their impact upon substantive, rather than purely procedural, rights.

**A.  <u>The August IEP Was Based Upon Inaccurate Test Scores and Was Invalid</u>**

The IHO was correct in determining that parents are entitled to a valid IEP as of the first

day of the school year (*see* 20 U.S.C. §§ 1414(d)(1)(A)(i), 1414(d)(2)(A); 34 C.F.R. §

300.323(a); § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]). The IHO was also correct in determining

that (i) the IEP team erred in relying upon a document that was incorrect; (ii) the

psychoeducational evaluation should have been corrected **prior** to the IEP team making its

recommendation (IHO Dec. 17); (iii) the District did not have appropriate documents in order to

determine an appropriate recommendation (IHO Dec. 21); and (iv) the absence of a valid IEP at

the beginning of the school year resulted in the District's failure to meet its Prong I burden.

An IEP that is based upon erroneous test scores cannot be considered valid (*see* 8

N.Y.C.R.R. 200.4(b)(6) (a school district must ensure that the assessments and measures they

use to evaluate a student are valid and reliable). The assessments conducted by Dr. Greenwell

that were used at the August IEP meeting were neither valid nor reliable because they were not

administered in accordance with applicable instructions which, as District witnesses conceded,

required a correct date of birth in order for the scores to be usable. The District, therefore, failed

to comply with 8 NYCRR 200.4(b)(6)(i)(b) and (c), which govern the validity of measurements.

When a school district, as here, fails to provide a student with a valid IEP at the time of

commencement of the school year, a parent is entitled to seek reimbursement for the costs

incurred in placing the student in an appropriate private setting. *See Reyes ex rel. R.P. v. N.Y.*

*City Dep't of Educ.,* 760 F.3d 211, 220–21 (2d Cir. 2014) in which the Second Circuit rejected a

claim by the DOE that it would rectify errors in an IEP after the school year commenced, stating:

> If we were to accept DOE's arguments relying on the possibility that there could be a
> later amendment to [the] IEP, then we would effectively require every parent to
> consider the likelihood of mid-year amendments in evaluating his or her child's IEP.
> This approach would create significant uncertainty regarding what special education

and related services the child would actually receive over the course of the academic year, undermining the tuition reimbursement system and the IDEA's promise of a free appropriate public education for every child with a disability. *R.E., 694 F.3d at 186.*

The documentary evidence in the case at bar establishes that the CSE notified the parents that it would be convening, **after** the 2015/16 school year commenced, to review the corrected version of the District's psychological assessment and the required classroom observation, which the District neglected to conduct in a timely manner (Ex. 18-00139). However, as caselaw establishes, it was legally improper for the District to attempt to cure errors in the August IEP by amending scores after the new school year had already begun. Such a conclusion is mandated by the Second Circuit decision in *R.E.* (694 F. 3d 167) in which the Court recognized the importance of a valid IEP, as the "centerpiece" of the FAPE process.  Indeed, the *R.E.* Court specifically noted that:

> At the time the parents must choose whether to accept a school district's recommendation or place the child elsewhere, they have only the IEP to rely on, and therefore the adequacy of the IEP itself creates considerable reliance interests for the parents. Under the Department's view, a school district could create an IEP that was materially defective, causing the parents to justifiably effect a private placement, and then defeat the parents' reimbursement claim at an [impartial] hearing with evidence that effectively amends or fixes the IEP…" (*Id.* at 186).

The August IEP was materially defective because it was based on incorrect scores and inaccurate interpretative data, which were predicated on the wrong year of birth. The *R.E.* Court specifically admonished that a District cannot affect a "bait and switch" (even if the baiting is done unintentionally) and that "a school district cannot rehabilitate a deficient IEP after the fact" (*Id.*). The District, in the present matter, attempted to rehabilitate the August IEP by asserting, after the fact, that the change in S.N.'s scores would not have affected its original program recommendation.[8] This is precisely the type of retrospective evidence that *R.E.* precludes. *See*

---

[8] The District's retrospective assertion that incorrect scores did not undermine the August IEP carries even less weight given that S.N.'s program recommendation was changed, mid-year, to a more restrictive program.

*also D.N. v. Board of Education of Center Moriches Union Free School District,* 2015 WL 5822226 (E.D.N.Y. September 28, 2015) (impermissible to use rationale that IEP will be subsequently modified in the future to address child's needs); *D.C. ex. rel. E.B. v. New York City Department of Education*, 950 F. Supp. 2d 494 (S.D.N.Y. March 26, 2013) (parents are entitled to rely on information that was given at the time that they were required to make a placement decision and not on retrospective testimony by District justifying placement).

The psychoeducational scores that the District relied on in developing S.N.'s August IEP (Tr. 64, 78) were inaccurate because they were age-driven assessments, utilizing age-based standardized norms. When the evaluator used an incorrect birth year, the resulting data, and the interpretation of that data, was also incorrect, as conceded by Dr. Greenwell (Tr. 265). Thus, at the time the parents were required to make a placement decision for the 2015/16 school year, the IEP that was supposed to inform their choice was invalid because it was based upon incorrect cognitive scores. The parents could not rely on the inaccurate information in the report, leaving Dr. Tagliareni's analysis of the need for an immersive, full-time special education program **as the only legitimate psychoeducational recommendation upon which they could rely**.

The District's position that there was no impact upon the integrity of the August IEP because the correction of the psychoeducational evaluation resulted in "higher" scores constitutes a clear violation of *R.E.'s* proscription against the use of retrospective testimony to legitimize an invalid IEP. Moreover, the District's attempt to justify the use of invalid scores is also not supported by the testimony, which demonstrates that a **greater** disparity in S.N.'s deficits, as compared to her overall cognitive and intellectual potential, was revealed when her tests were rescored after the 2015/16 school year commenced (Tr. 781-784).

The parents had no way of knowing, at the time they had to make a placement decision in late August, what the results and the analysis of rescoring would be. What they had from the District, at the operative time in question, was an invalid IEP upon which they could not place any reliance. The invalidity of the August IEP is not merely a procedural violation, but goes to the heart and substance of IDEA rights and obligations. It is also a legal question, which does not implicate administrative deference requirements. The SRO's decision did not comport with governing law and is not entitled to deference. It is respectfully submitted that this Court should adopt the IHO's findings and conclude that reimbursement is warranted due to the District's failure to have provided S.N. with a valid IEP at the beginning of the 2015/16 school year.

### B. The District's Failure to Conduct a Classroom Observation and Assess S.N.'s Functional Abilities in a Classroom Implicated Substantive Rights

When a student suspected of having a disability is referred to a CSE, the CSE must ensure that an evaluation of the referred student is performed, which must include, *inter alia,* an individual psychological evaluation, a social history, an observation of the student in the current educational placement, and other appropriate assessments or evaluations as necessary to ascertain the physical, mental, behavioral, and emotional factors which contribute to the suspected disabilities (8 NYCRR 200.4[a], [b], [j][1]; see 34 CFR 300.301). In view of the fact that a student's functionality is central to developing an appropriate IEP, governing regulations require that the evaluation of a student suspected of having a learning disability "include information from an observation of the student in routine classroom instruction and monitoring of the student's performance" (*see* 8 NYCRR 200.4[j][1][i], [2]; 200.4[b][5]; 34 CFR 300.308[a], 300.310; *Application of a Student Suspected of Having A Disability*, Appeal No. 15-038).

A classroom observation, and the opportunity to speak with S.N.'s teachers, was critical in this case because there was insufficient information regarding S.N.'s present levels of

performance in terms of her ability to conduct herself and succeed in a general education classroom. A classroom observation was also essential for purposes of assessing S.N.'s functionality because, even as District witness McNamara conceded, a child is not simply an amalgam of test scores (Tr. 538). The District realized that a classroom observation, including the opportunity to speak with Windward teachers, was essential in this case and that is one of the primary reasons why the District reconvened and conducted a new IEP meeting in November. Thus, as the District's own actions have demonstrated, information regarding Windward's view of S.N.'s functional abilities was pivotal in determining a substantively appropriate program.

Accordingly, the record reflects that the absence of a classroom observation and input from Windward staff resulted in a substantively deficient program recommendation and denied S.N. a FAPE. A procedural violation will entitle a parent to tuition reimbursement if it impeded a child's right to a FAPE or caused a deprivation of educational benefits. *See R.E.* (694 F.3d at 190). The IHO persuasively explained why the absence of important information regarding S.N.'s classroom functionality resulted in a denial of a FAPE. The SRO did not provide cogent reasons for disturbing the IHO's finding, which is fully supported by the record.

### C. **The August IEP Was Substantively Insufficient**

S.N.'s August IEP was developed without sufficient information regarding her ability to perform in a mainstream classroom and without an adequate basis for determining whether her present levels of performance, her functional levels, her anxiety and her distractibility would hinder her ability to make progress in a general education classroom of over 20 students. The CSE was aware that the attempt to mainstream S.N. at Solomon Schechter was unsuccessful and that she regressed, even with classroom support and accommodations. The CSE was also aware that its scores were incorrect and that the only valid, most recent psychoeducational evaluation

resulted in diagnoses of severe dyslexia, ADHD, as well as a recommendation for a small, immersive full-time special education program. Dr. Tagliareni was clear, after conducting comprehensive testing, that S.N. needed academic remediation and she was also clear that S.N. was not able to keep pace in a general education classroom and that she needed a similarly functioning peer group to minimize distractibility, sustain confidence and modulate her anxiety.

Based on the instant record, the District failed to establish, by a preponderance of the evidence, that the District's general education program recommendation was reasonably calculated to enable S.N. to make educational progress. Certainly, when the CSE had all the necessary and appropriate evaluative material in November, it recognized the insufficiency of the August IEP recommendation. The District should have conducted a classroom observation and spoken with S.N.'s teachers; it should have been more careful in scoring S.N.'s tests; and it should have recognized that the progress S.N. made, using Windward strategies, was a result of her having been placed in a specialized environment and did not constitute evidence that she could succeed in a general education setting or that such a setting could meet her needs.

Based on the foregoing, the IHO was correct in determining that (i) there was insufficient evidence that the modifications and accommodations proposed by the District would be sufficient for S.N. in a general education setting; (ii) there was no discussion about S.N. being ready to transition into a large school setting with large classrooms or the additional distraction that would result from a larger class and school setting; (iii) inadequate consideration was given to how a mainstream setting would affect S.N.'s confidence or level of anxiety; and (v) there was insufficient evidence regarding how S.N would perform in a mainstream class (IHO Dec. 20). Accordingly, the IHO's conclusion that the District failed to recommend an appropriate program for S.N. is fully supported by the preponderance of evidence in the record.

**POINT II: Deference to the IHO's Prong II and Prong III Findings Is Warranted**

The IHO correctly ruled in favor of the parents regarding Prongs II and III of the

*Burlington/Carter* criteria (IHO Dec. 24-25). The SRO did not address these Prongs (SRO Dec.

22). Accordingly, deference to the IHO's decision with respect to these issues is warranted. *See*

*M.H.*, 712 F. Supp. 2d at 163 (quoting *Gagliardo*, 489 F.3d at 114); *see also C.F. ex rel. R.F. v.*

*New York City Dep't of Educ.*, 746 F.3d 68 (2d Cir. 2014).

## CONCLUSION

Based on the foregoing, the parents respectfully request that an order be issued

overturning the decision of the SRO; granting the Plaintiffs' motion for summary judgment; and

awarding them full reimbursement for the tuition and other costs incurred in connection with

their placement of S.N. at the Windward School for the 2015-2016 school year.


Dated: September 18, 2017                         Respectfully Submitted:

Diana Gersten, Esq.
Linda Goldman, Esq.
Law Offices of Regina Skyer and Associates
276 5th Avenue
New York, New York 10001
(212) 532-9736
DGersten@skyerlaw.com

25