UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Y.N. and SH. N., *individually and on behalf of S.N., a child with a disability*,

                                   Plaintiffs,

        v.

BOARD OF EDUCATION OF THE
HARRISON CENTRAL SCHOOL
DISTRICT,

                                   Defendant.

No. 17-CV-4356 (KMK)

OPINION & ORDER

Appearances:

Diana K. Gersten, Esq.
Jesse C. Cutler, Esq.
Linda A. Goldman, Esq.
Skyer, Castro, Foley & Gersten
New York, NY
*Counsel for Plaintiffs*

Mark. C. Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Parents Y.N. and Sh. N. ("Plaintiffs") brought this Action individually and on behalf of

their daughter, S.N., against the Board of Education of the Harrison Central School District

("Defendant" or "the District") under the Individuals with Disabilities Education Act ("IDEA"),

20 U.S.C. § 1400 et seq.  (*See* Compl. (Dkt. No. 1).)  The dispute arises out of the decisions of

the Independent Hearing Officer ("IHO") and the State Review Officer ("SRO") who

adjudicated Plaintiffs' administrative claims for relief arising out of Defendant's alleged failure

to provide S.N. a free and appropriate public education ("FAPE") during the 2015-2016 school

year.  Before the Court is Plaintiffs' Motion for Summary Judgment.  (Notice of Mot. (Dkt. No.

11).)  For the following reasons, the Motion is denied.

I.  Background

A.  Factual Background[1]

S.N. was born on December 16, 2005.  (IHO Transcript ("Tr.") 167.)  She attended

Solomon Schecter School, a private, general education Jewish day school in White Plains, New

York, for kindergarten through second grade.  (*Id.* at 1012, 1068.)  While there, Plaintiffs

believed S.N. was "falling behind" in the classroom curriculum.  (*Id.* at 1012–13.)  Specifically,

due to her "inconsistent" academic functioning and her difficulties with reading comprehension

and hearing, in spring of 2013, while she was in first grade, S.N. underwent a private

psychoeducational evaluation, (District Exhibits ("SD Ex.") 7 at 51), and an audiological

evaluation, (SD Ex. 6 at 49; SD Ex. 8).  As a result of these evaluations, S.N. was diagnosed with

a specific learning disorder with impairment in reading, attention deficit hyperactivity disorder,

unspecified anxiety disorder, (SD Ex. 7 at 62), and a central auditory processing disorder, (SD

Ex. 8 at 70).  Therefore, during the 2013-2014 school year, the White Plains Central School

District, the district where Solomon Schecter was located, classified S.N. as having an "Other

Health Impairment," a qualifying disability under the IDEA, *see* 34 C.F.R. § 300.8(a)(1), and

created an Individualized Education Plan ("IEP") for her.  (Parents' Exhibits ("Pls.' Ex.") L-1.)

---

[1] Because the Parties did not submit Rule 56.1 statements, the facts are drawn from the certified administrative record, which was filed under seal.  (Dkt. No. 22.)  The record includes, among other things, Plaintiffs' exhibits, Defendant's exhibits, the Parties' correspondence and pleadings before the IHO and SRO, and transcripts of the IHO hearing.  The Court will cite to these types of documents separately, even though they were filed all together in one document.  The Court will cite to the exhibits based on the page number given in the right-hand corner of the page.

Specifically, the IEP recommended direct consultant teacher services and supplementary accommodations in the classroom, as well as a specially designed separate reading class, beginning in November 2013, and noted that S.N. needs to improve her skills in decoding, reading comprehension, writing, and math.  (Pls.' Ex. L-1, L-4, L-8.)

However, Plaintiffs decided that S.N. would not return to Solomon Schechter after second grade.  (Tr. 1074.)  In August 2014, they hired Dr. Laura Tagliareni ("Dr. Tagliareni") to conduct a neuropsychological evaluation of S.N. "to assess her cognitive, academic, and social-emotional functioning and to assist in ongoing educational and treatment planning."  (SD Ex. 13 at 88, 97.)  After conducting several tests and clinical observations on four different occasions, Dr. Tagliareni made several findings.  First, she concluded that S.N. had "clear weaknesses" in language processing, expressive language skills, and "rapid automatized naming and comprehension skills," which are "necessary . . . for the development of reading skills."  (*Id.* at 95.)  Dr. Tagliareni also found that S.N. "meets criteria for ADHD, Combined Presentation." (*Id.*)  Additionally, she concluded that S.N.'s "cognitive and academic profile is consistent with a severe language based learning disorder," including "criteria for Dyslexia as well as a Specific Learning Disorder, with impairments in mathematics.  (*Id.* at 96.)  And, "[S.N.'s] weaknesses in language skills and attention further impede her learning skills and academic performance, warranting greater interventions."  (*Id.*)  Dr. Tagliareni explained:

> Even with the implementation of special education services, [S.N.] has failed to make appropriate progress and is at risk for greater regression if she does not receive a more appropriate special education program. These findings clearly indicate the need for a special education placement with more intensive services. She requires remediation in academic skills as well as attention and language skills.

(*Id.*)  She also noted that S.N. was "experiencing symptoms anxiety" because of her perceived academic failures.  (*Id.*)  Dr. Tagliareni therefore made six recommendations for S.N.: (1) she

"requires a small, full time special education program that provides her with the specialized instruction and supports that she needs in order to make appropriate progress," as "part of a small, language-based, special education school;" (2) she "requires speech and language therapy to address her expressive language and comprehension skills;" (3) she "should be given any curriculum modification and aids available at her school that will help organize her," including special seating, frequent prompting, instructor monitoring of comprehension, reading test instructions aloud, extended time, and encouraging her participation; (4) she should receive individual psychotherapy, targeting her anxiety and strengthening her self-esteem; (5) she should continue her "involvement in mainstream extracurricular activities;" and (6) she should undergo "periodic neuropsychological re-evaluations . . . in order to assess her continued cognitive, educational, and emotional needs."  (*Id.* at 96–97.)

Plaintiffs placed S.N. at the Windward School, a private special education day school, for third grade—the 2014-15 school year.  (Tr. 1077.)  They did so after reaching out to the District, S.N.'s district of residence, seeking an IEP for her, (Pls.' Ex. D; *id.* Ex. K-1), which the District declined to do until S.N. was formally enrolled in the District, (SD Ex. 1 at 2).  Plaintiffs commenced an Impartial Hearing against Defendant seeking reimbursement for the Windward tuition for the 2014-15 school year, which was resolved by stipulation of settlement dated June 21, 2015.  (SD Ex. 35.)  The settlement included agreement that "[t]o the extent [Plaintiffs] [are] seeking FAPE from the District for the 2015/16 school year, [they] shall complete a registration packet . . . [and] [t]he District shall convene a CSE meeting to prepare an [IEP] for [S.N.] for the 2015/16 school year."  (*Id.* at 182.)  As part of this process, Plaintiffs "shall provide the District with all evaluations of [S.N.]," and consent to the District "conduct[ing] reasonable observations

of [S.N.]." (*Id.*) Plaintiffs reserved the right to pursue any claims relating to the 2015-16 school year. (*Id.*)

Plaintiffs submitted registration materials and existing evaluations to the District on May 11, 2015. (Pls.' Ex. J; *see also id.* Ex. E-3–4 (additional evaluations); SD. Exs. 6–13.) Plaintiffs authorized the release of S.N.'s educational records to the District on May 29, 2015. (SD Exs. 20–21.) On June 4, 2015, Plaintiffs, through counsel, informed the District's counsel that Plaintiffs were seeking a FAPE. (Pls.' Ex. F-1.) On June 22, 2015, after the stipulation of settlement was signed, the District requested consent from Plaintiffs to conduct additional evaluations of S.N. (SD Exs. 22–23; Tr. 72–73, 1084–85.) After receiving Plaintiffs' consent, the District had until June 26, 2015 to evaluate S.N. before she left for sleep-away camp until August 16, 2015. (Tr. 66–67, 74, 1087; Pls.' Ex. E-3.) As a result, no classroom observation was completed, because classes at Windward had ended on June 11, 2015, (Tr. 84–85, 1087–91; SD Ex. 21), and S.N. was not in any classroom from June 21 through August 4, 2015, (Tr. 1093).

On June 23, 2015, S.N. underwent a District educational evaluation, conducted by special education teacher Rosita McNamara ("McNamara"), M.S. Ed., in which she scored in the average range in all categories except reading comprehension, nonsense word decoding, and decoding fluency, in which she scored in the below average range. (Pls.' Ex. N-5.)[2] On June 24, 2015, Dr. Rebecca Greenwell ("Dr. Greenwell") conducted a psychological evaluation of S.N. (Pls.' Ex. M.) However, Dr. Greenwell incorrectly listed S.N.'s date of birth as December 16, 2004, instead of 2005. (*Id.* at M-1; *cf.* SD Ex. 15 (changing date); *id.* Ex. 18 (noting date

---

[2] The test summary section lists these sections as involving below average scores, but the test results section earlier listed that S.N. scored in the "average" range on decoding fluency. (*Compare* Pls.' Ex. N-4 *with id.* Ex. N-5.) McNamara testified that this was a typographical error. (Tr. 527.)

change).)  Dr. Greenwell made her assessment based on a review of S.N.'s records, behavioral observations, administering the Woodcock-Johnson III Test of Cognitive Abilities, and applying Beck Youth Inventories, a behavioral assessment.  (Pls.' Ex. M-2.)

Dr. Greenwell noted that S.N.'s "attention and concentration levels were variable," and "[s]he displayed some confusion related to understanding and applying verbal directions."  (*Id.* at M-5.)  Dr. Greenwell also concluded that S.N.'s "overall intellectual abilities" fell "within the Low Average range of functioning for her age," but "significant variability existed within her cognitive profile."  (*Id.*)  Specifically, S.N. "demonstrated a strength in Visual-Spatial Thinking," but "[h]er skills in the areas of Long-Term Retrieval and Processing Speed were found to be age-appropriate and adequate for academic learning."  (*Id.* at M-5–6.)  Dr. Greenwell explained that while S.N.'s Fluid Reasoning skills were average, "she displayed a weakness on a task assessing her inductive reasoning skills" in the low average range, indicating that S.N. "may experience difficulty developing new concepts and making inferences."  (*Id.* at M-6.)  Additionally, S.N. tested Average on Short-Term Memory, but "displayed weaknesses on working memory tasks . . . with skills ranging from [b]orderline to [l]ow [a]verage."  (*Id.*)  "Finally, [S.N.] evidenced a weakness in the area of Verbal Ability/Comprehension-Knowledge," as she had intact linguistic reasoning skills but "difficulty assessing and verbally producing responses related to her general fund of information." (*Id.*)  Dr. Greenwall concluded that "[o]verall, [S.N.] displays weaknesses with certain aspects of cognitive functioning and psychological processing that may impact her ability to meet state-approved grade level standards."  (*Id.*)  She therefore made several recommendations for S.N.:

- Activate prior learning and semantic information when teaching new concepts
- Keep instructions simple and provide verbal clarification as needed

- Encourage [S.N.] to continue advocating for herself and requesting clarification when she does not understand directions or task demands
- Pre-teach relevant vocabulary or background knowledge
- As [S.N.] displays weaknesses in verbal skills and strengths in visual skills, use multi-sensory learning techniques and visual cues when possible to facilitate learning and encoding of information
- High rates of repetition, re-teaching, and practice of new skills due to weaknesses in working memory
- Due to weaknesses in inductive reasoning, use real objects, manipulatives, and/or modeling to help develop concepts
- Provide encouragement to attempt difficult tasks, coupled with praise and positive reinforcement for effort

(*Id.*)

S.N. also underwent a speech and language evaluation by Claire Zucker ("Zucker"), a speech/language pathologist, who administered the CELF-5, TAPS-3, and CTOPP-2 tests.  (SD Ex. 16.)  The results indicated that all of S.N.'s "scores were within the average range, indicating average receptive and expressive language skills as well as average short term auditory working memory."  (*Id.* at 119.)  Zucker noted that S.N.'s listening comprehension skills were in the average range during testing, but "she demonstrated a relative weakness in the area of inferential reasoning."  (*Id.*)  Moreover, S.N. "demonstrated strong metacognition," correcting her own errors.  (*Id.*)  Despite her average range performance on all tasks, she exhibited "a relative weakness in the area of language processing of lengthy complex information when not provided with picture cues, print or answer choices."  (*Id.*)  S.N. also "requested repetition of oral information and benefitted from wait time while processing and formulating responses," and sometimes "needed additional explanation of directions."  (*Id.*)  Zucker recommended that S.N. be (1) allowed wait time for processing and responding; (2) provided information in chunks and be asked to paraphrase information to check for understanding; (3) provided additional examples for novel assignments; (4) shown auditory messages with visual pairs; (5) required to

demonstrate and practice memory strategies; and (6) work on inference-based questions.  (*Id.* at 120.)

The new evaluations were mailed to Plaintiffs in advance of the scheduled CSE meeting. (SD Ex. 25.)  Plaintiffs also met with the evaluators in advance to discuss their findings.  (Tr. 284, 525–26, 1094–95.)  On August 4, 2015, the CSE met.  (SD Ex. 4.)  The meeting was chaired by Julie Snider ("Snider"), the Director of Special Education for the District, and also attended by Dr. Greenwell, McNamara, Zucker, general education teacher Lauren Fahey, and S.N.'s mother, Sh. N. (one of the two Plaintiffs).  (*Id.* at 24.)  The CSE classified S.N. as having a learning disability and found her eligible for special education and related services.  (*Id.*)  In formulating its recommendations for an IEP, the CSE reviewed all of S.N.'s prior evaluations, including her report cards from Solomon Schechter and Windward, and test results, and identified her present levels of performance and individual needs.  (*Id.* at 26–31.)  The CSE noted that S.N. needs to improve her study skills, phonic and word analysis skills in decoding, reading comprehension skills, including inferential questions, and her math calculation skills, but found that S.N. did not have social, emotional, physical, or motor needs that required special education intervention.  (*Id.* at 29–30.)  Thus, the IEP set forth measurable annual goals in study skills, reading, and math.  (*Id.* at 31–32.)

Ultimately, the CSE recommended an IEP for the 2015-16 school year including direct and indirect consultant teacher services in the classroom for 45 minutes on a 1 x 6 day cycle, and a resource room program in a 5:1 ratio for 45 minutes on a 5 x 6 day cycle.  (*Id.* at 24, 32.)  It also recommended several supplementary aids and services and accommodations in the classroom as needed daily, including extra time to process and formulate responses, breaking down instructions and directions, providing additional examples, providing visual cues and

manipulatives, providing S.N. with a graphic organizer, asking S.N. to paraphrase, providing

special seating arrangements, and checking for understanding.  (*Id.* at 32–33.)  In summarizing

its rationale for these recommendations, the CSE meeting summary states:

> Chairperson next explained the continuum of services and the CSE's charge to make recommendations for students in their least restrictive environment.  The committee recommended a [r]esource [r]oom program to address IEP goals and to deliver the specialized and targeted instruction in the areas of need.  Consultant Teacher services in the general education classroom were also recommended to ensure generalizability of learned skills into the general education classroom. Mother is unsure of the decision and wonders whether the student needs a small class setting all day like Windward.  The team explained that a special class program all day or an integrated co-teaching program all day would be overly restrictive.  The student has a mild disability and she can access the general education curriculum with [r]esource [r]oom support and accommodations. The rest of the IEP was collaboratively developed. . . .

(*Id.* at 25; *see also* Tr. 93–94 (Snider testifying that "mild is not a technical standardized testing

term," but conveys that S.N. has "average skills in the academic testing and there were very

discrete areas that needed to be addressed"); *id.* at 1037 (Sh. N. testifying that she thought it was

"too mild of a program for [S.N.]".)

On August 19, 2015, Plaintiffs, through counsel, notified the District of their intent to

place S.N. at the Windward School for the 2015-16 school year and to seek reimbursement for

the tuition if the District did not fix certain procedural and substantive errors in the proposed IEP

that denied S.N. a FAPE.  (SD Ex. 28.)  Specifically, Plaintiffs argued that (1) they were "denied

meaningful participation in the development of the IEP," as Sh. N.'s and Dr. Tagliareni's

opinions that S.N. "requires a full-time special education program" were "completely

disregarded at the meeting;" (2) the resource room recommendation "[wa]s inappropriate to meet

[S.N.]'s significant educational needs" and would cause her to miss special classes she enjoys;

(3) the CSE failed to conduct a social history and a structured observation of S.N.; (4) the

characterization of S.N.'s disability as "mild" was incorrect; (5) there was incorrect reporting of

S.N.'s scores on the speech/language evaluation end educational evaluation; and (6) there was reliance on Dr. Greenwell's evaluation, which refers to an incorrect birthdate for S.N.  (*Id.* at 163–64.)  Plaintiffs contended that "[t]hese mistakes are just examples of the CSE's misunderstanding of [S.N.'s] complex needs," which resulted in a minimal program recommendation, immeasurable goals, and classroom accommodations that cannot be implemented "throughout the day."  (*Id.* at 164.)

Snider, on behalf of the District, responded to Plaintiffs' letter.  (SD Ex. 29.)  First, she explained that no classroom observation was possible because school was not in session, but one could occur "once school has started," attaching a consent form.  (*Id.* at 165.)  Second, Snider noted that the CSE reviewed social history from the private neuropsychological report and other developmental milestones and school history.  (*Id.*)  With respect to Dr. Greenwell's results, Snider reported that she "will review that she ran the WJIII scores correctly using [S.N.]'s correct Date of Birth" and it will be verified and shared with Plaintiffs when school resumes. (*Id.*)  Snider also stated that the CSE determined that a special class program all day "would be overly restrictive."  (*Id.*)  She also disputed several facts asserted in Plaintiffs' letter, contending that S.N. would not need to miss special classes for resource room period; S.N.'s below average scores were correctly indicated in the CSE minutes and in the speech and language evaluations; and S.N. will receive 45 minutes of special education on five of six days, not nine minutes.  (*Id.* at 165–66.)

On October 14, 2015, Debra Saffos ("Saffos"), a speech and language therapist, conducted a classroom observation of S.N. in her fourth grade language arts class at Windward. (SD Ex. 19; Tr. 111.)  Saffos gave S.N. the score of "at expected grade level" in readiness skills, reading, attention, self-control, independence, interaction with adults, organizational skills,

following routines, following directions, and expressive language-responses in group discussion. (SD Ex. 19 at 148.)[3]  Saffos also commented that S.N. "participated enthusiastically, and was engaged throughout the lesson," and S.N.'s teacher reported that S.N. "is an accurate and careful reader who uses reading strategies," but "she still exhibits some vowel confusion and is working on reading of phrases to improve fluency."  (*Id.*)

On November 23, 2015, a subcommittee of the CSE convened to review the classroom observation results and Dr. Greenwell's revised evaluation.  (SD Ex. 5 at 36.)  Windward staff participated in the meeting by telephone.  (*Id*; *see also* Tr. 215 (identifying Beardsley); Pls.' Ex. W-2 (identifying Diller).)  They described S.N. as lower functioning and in higher need than the way her skills were represented in her previous Windward report cards; namely, she had much greater difficulties in reading, writing, and math.  (Tr. 312–13, 556–57; SD Ex. 5 at 40–41; *see also* Tr. 697 (Saffos testifying that "they were describing a student that sounded like she was struggling more than I observed").)  As to Dr. Greenwell's revised results, the CSE minutes noted that running the test with S.N.'s correct birthday resulted in "improved" new scores, which the CSE reviewed.  (SD Ex. 5 at 37; *compare* Pls.' Ex. M (original report) *with* SD Ex. 18 (revised report) (showing increase in General Intellectual Ability score, Comprehension-Knowledge standard score, Thinking Ability score, Visual Auditory learning, Retrieval Fluency, Visual-Spatial Thinking, Picture Recognition, Auditory Processing, Fluid Reasoning, Cognitive Efficiency Processing Speed, Short-Term Memory, Working Memory, but omitting score on Long-term retrieval and comparison scores for Auditory Working Memory and showing same percentile for Superior Working Memory skills); *see also* Tr. 271–72 (Greenwell testifying that

---

[3] The "Reading" category says "1-2," but the "2" is bolded.  (SD Ex. 19 at 148.)  1 means "below expected grade level" and 2 means "at expected grade level."  (*Id.* at 147–48.)

the change "resulted in . . . a slight increase in [S.N.'s] standard scores in each of [the] areas that were assessed," but her cognitive "profile of strengths and weaknesses remained consistent").) After reviewing this information, the CSE changed S.N.'s IEP to include four hours daily integrated co-teaching, instead of consultant teaching services, and continued the resource room support.  (SD Ex. 5 at 36–37.)  The meeting minutes indicate that the Windward teachers and Plaintiffs "agreed that this level of services was appropriate."  (*Id.* at 37.)  Snider, Dr. Greenwell, and McNamara testified that such changes were not warranted by the corrected scores in Dr. Greenwell's report, but rather attributed to the statements of Windward staff.  (Tr. 115–16, 309–12, 563.)  Additionally, the CSE added several math and writing goals to S.N.'s IEP.  (SD Ex. 5 at 37, 44–45.)

### 1.  Due Process Complaint and IHO Decision

On January 28, 2016, Plaintiffs filed a complaint requesting an impartial due process hearing under 20 U.S.C. § 1415.  (SD Ex. 1.)  The due process complaint notice alleged that the District failed to provide S.N. with a FAPE on procedural and substantive grounds and requested reimbursement for the 2015-16 school year tuition at Windward.  (*Id.* at 1.)  Plaintiffs alleged that this denial of FAPE was based on, but not limited to, the following factors:

- The CSE "failed to consider critical substantive information" provided by Plaintiffs and Dr. Tagliareni, thereby denying Plaintiffs "meaningful participation in the development of the IEP" and depriving S.N. of "important educational benefits that were necessary to enable her to make educational progress."
- The August 4, 2015 IEP notes that S.N. needs "specialized instruction," but only provided for "[r]esource [r]oom 5 times per 6 day cycle . . . in a group of 5 children," which "does not allow for sufficient specialized and direct instruction."
- "[I]n order to receive [r]esource [r]oom, [S.N.] would be pulled out of her classroom, causing her to miss valuable instruction time within the classroom."
- The CSE "failed to conduct both a social history and a structured observation of [S.N.]."  Reliance on Dr. Tagliareni's report for social

history was improper because it contained no such section and was not updated. Moreover, the "CSE had more than sufficient time to observe [S.N.]" having known about her suspected disability since 2013 and having her enrollment form in May 2015, but "failed to make any arrangements to observe [her] in a classroom or other setting."

- The CSE mischaracterized S.N.'s disability as "mild" even though her reading comprehension and decoding scores are "below average," and she met the criteria for dyslexia and was diagnosed with ADHD and a Learning Disorder in reading and math.

- The August 4th IEP contains "inaccuracies in the reporting of [S.N.]'s scores," including: listing some tests as average when subtests were low average in the IEP and in the educational evaluation, and the misreporting of S.N.'s birthdate in the psychological evaluation, resulting in a minimal recommended program, immeasurable goals, and classroom accommodations that are impossible to implement.

- Plaintiffs were not provided with a valid IEP as of the date of commencement of the 2015-16 school year, and it was legally improper for the District to attempt to cure the deficiencies after the school year had begun.

(*Id.* at 3–5.)

On April 28, 2016, Sharyn Finkelstein Esq., the appointed IHO ("IHO") commenced an impartial hearing, which ended on November 18, 2016 after five nonconsecutive days of testimony. (Findings of Fact & Decision ("IHO Decision") (Dkt. No. 22).) On January 12, 2017, the IHO issued a decision finding that the District failed to offer S.N. a FAPE for the 2015-16 school year and directing the District to reimburse Plaintiffs for the cost of Windward tuition for that year. (*Id.* at 25–26.) The IHO first addressed the stipulation of settlement, which she admitted into evidence because it was relevant to when the District's obligations began for the 2015-16 school year. (*Id.* at 11.) The IHO concluded that the stipulation "does not remove the [D]istrict's obligation to have taken all necessary steps to provide [S.N.] with a FAPE for the 2015-16 school year," and thus rejected the District's argument that the short timeframe between signing the stipulation and S.N. leaving for camp limited its ability to conduct an observation at Windward, because "there is no legal justification for the [District] to have waited for a signing

of an agreement for the 2014-15 school year to take steps to ensure a FAPE for [S.N.] for the 2015-16 school year."  (*Id.* at 11–12.)  Rather, the IHO found "that the evidence clearly establishes that [S.N.] was seeking a FAPE" for that year prior to signing the settlement and "the District was certainly on notice."  (*Id.* at 12.)

The IHO therefore concluded that the District should have conducted a classroom observation of S.N. at Windward, particularly when no one from Windward participated at the CSE meeting.  (*Id.* at 15.)  Specifically, the IHO found "that the [CSE] needed to see and know how [S.N.] was functioning in her then present school" to decide whether "a change to a general education school would be appropriate."  (*Id.* at 16.)  The IHO further noted that the input of Windward staff "was crucial to any program recommendation," as evidenced by the fact that the District relied "solely on information they obtained from the Windward staff" in changing S.N.'s IEP at the second CSE meeting.  (*Id.*)  Thus, the IHO found that "there probably would not have been a need for a modified IEP" if Windward staff had participated in the initial CSE meeting, and "their lack of participation was the result of the District failing to act in a timely manner." (*Id.*)[4]  Put differently, the IHO found "that had the information [from Windward] been available in August[,] [S.N.] would have had an IEP with the recommendation of a more restrictive setting."  (*Id.* at 21.)

Relatedly, the IHO agreed with the District that the CSE reconvened in November to consider new information and that it was obligated to do so, but found that this new information "w[as] the result of [the] District's error or omission," which relates to the District's "wait[ing] too long to begin [its] evaluations."  (*Id.* at 20–21.)  The IHO concluded that if the District began

---

[4] The IHO also rejected the District's argument that Plaintiffs failed to raise this point in their due process complaint, pointing to such a reference.  (IHO Decision 16.)

its evaluations prior to signing the stipulation, it would have had "ample time to correct any errors . . . , to conduct an observation, and to speak with staff at Windward, prior to the IEP meeting." (*Id.* at 21.)  With respect to the incorrect birth date used in Dr. Greenwell's evaluation, the IHO found "that the [CSE] relied on a document that was incorrect" and "that the change in document needed to have been done prior to making the recommendation" for S.N.'s IEP.  (*Id.* at 17.)

The IHO also noted that "[t]here was no discussion about the fact that [S.N.] had been in a full time specialized program" and how that would affect her IEP.  (*Id.* at 20.)  Specifically, the IHO pointed to lack of discussion regarding whether the program modifications and testing accommodations in S.N.'s IEP would be "sufficient for [S.N.] in a general education setting," as opposed to a specialized school, whether S.N. was "ready to transition into a large school setting with large classrooms," although she had attention difficulties and issues with confidence and anxiety and had "been unsuccessful in a prior mainstream setting."  (*Id.*)  The IHO therefore found "that the District failed to address [S.N.]'s individual needs."  (*Id.*)

The IHO therefore held that the District did not provide S.N. with a FAPE for the 2015-16 school year, because "the IEP was procedurally and substantively inappropriate."  (*Id.* at 21.)  She noted that "the District did not have the appropriate documents in order to determine an appropriate recommendation," including a psychoeducational evaluation with a correct birth date, nor did it have observation at or participation from Windward or information about S.N.'s "ability to function in a mainstream setting."  (*Id.*)  The IHO then concluded that Plaintiffs met their burden of showing that Windward was an appropriate placement for S.N.  (*Id.* at 23–25.)  Finally, the IHO concluded that the equities would not bar Plaintiffs from reimbursement.  (*Id.* at 25.)

However, the IHO rejected several of Plaintiffs' arguments.  First, she concluded that the use of the word "mild" to describe S.N.'s disability was not "a determining factor in the type of recommended program," citing Snider's testimony.  (*Id.* at 18.)  Second, the IHO rejected Plaintiffs' argument that the District was obligated to conduct a social history or that failure to do so deprived S.N. of a FAPE, because this was not an initial evaluation; rather, S.N. was already deemed eligible for IDEA services by the White Plains School District, and the CSE had information about S.N.'s social history from providers and previous evaluations, which Sh. N. did not correct or add to at the IEP meeting.  (*Id.*)  Third, the IHO found that Plaintiffs were "given every opportunity to participate in a meaningful way" in the development of S.N.'s IEP, citing evidence that Plaintiffs received copies of the evaluations for review, all the evaluators met with Sh. N. "to make sure she understood the results" and "could fully participate at the meeting" and "listened to [her] feedback," including responding to her concern about the need for a smaller setting all day like at Windward.  (*Id.* at 18–19.)  Fourth, the IHO concluded that the District is "only obligated to consider outside reports but not to necessarily agree and follow their recommendations," and the evidence suggested the District reviewed Dr. Tagliareni's recommendations, even if it did not adopt them.  (*Id.* at 19.)  Fifth, the IHO rejected Plaintiffs' argument that the IEP goals were "vague and inadequate," noting that they were discussed in depth, agreed to, and based on the information before the CSE.  (*Id.*)  Finally, the IHO found "no basis" for Plaintiffs' argument that S.N. would "miss[] valuable instruction when she was pulled out of class" for the resource room program, although she did note that the District concomitantly provided "no explanation why [it] felt that [S.N.] did not need the resource room every day," as opposed to five times every six days.  (*Id.* at 20.)

2.  SRO Decision

Defendant appealed the IHO's decision.  (Notice of Intention to Seek Review (Dkt. No. 22).)  On March 24, 2017, the SRO modified the IHO's decision by reversing the portions which found that Defendant failed to offer S.N. a FAPE for the 2015-16 school year and which directed Defendant to reimburse Plaintiffs for the cost of Windward tuition.  (SRO Decision 23 (Dkt. No. 22).)  The SRO began her analysis by addressing the scope of the impartial hearing, concluding that any finding of a child find violation by the IHO was outside said scope because that issue was not raised in Plaintiffs' due process complaint, but the other issues evaluated by the IHO— the failure to conduct an observation at Windward and procure the presence of Windward staff at the August CSE meeting, the timeliness of the District's evaluations, the sufficiency of the IEP for the general education setting and S.N.'s potential anxiety in such a setting—were all properly considered.  (*Id.* at 10–11.)[5]  Additionally, the SRO rejected the District's argument that the IHO misapplied the June 2015 settlement agreement, concluding that the IHO did not base her finding of an IDEA violation on the settlement, but "she correctly noted that the settlement agreement did not release the [D]istrict from its obligation to 'take all necessary steps' to provide [S.N.] with a FAPE for the 2015-16 school year."  (*Id.* at 11.)  Finally, the SRO noted that "[t]he IHO also made a number of findings that were not cross-appealed or asserted as alternate grounds for affirmance by" Plaintiffs—namely, that the IEP's characterization of S.N.'s disability as "mild" and lack of current social history did not deny her a FAPE, that Plaintiffs were able to participate

---

[5] The "child find" obligation under the IDEA requires that "each state receiving federal funds must have in effect policies and procedures by which it will identify, locate, and evaluate all children with disabilities," or children "who are suspected of being a child with a disability" that are "residing in the State to determine whether these children require special education and related services."  *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 659–60 (S.D.N.Y. 2011) (alterations and internal quotation marks omitted).

in the CSE meeting, that the CSE adequately considered the private neuropsychological report, and that the IEP goals were sufficient to address S.N.'s areas of need—and thus "they have become final and binding on the [P]arties." (*Id.*)

The SRO next considered the sufficiency and consideration of evaluative information before the August 2015 CSE. (*Id.* at 11–19.) First, the SRO concluded that "[a] review of the hearing record shows that the IHO correctly found that the [D]istrict's failure to act in a timely manner resulted in the Windward staff not participating in the August 2015 CSE, and that this contributed to the CSE not having information regarding [S.N.'s] functional performance." (*Id.* at 11–12.) However, the SRO found that, while the later additions to S.N.'s IEP in November 2015 were based on information provided by Windward staff—specifically, the 2015-16 language arts teacher—the new information was about S.N.'s functioning during the 2015-16 school year, *not* the 2014-15 school year. (*Id.* at 12.) "Accordingly, that the CSE modified its recommendation based on [that] input cannot be taken to mean that [S.N.]'s functional performance during the 2014-15 school year at Windward was different than reflected in the 2014-15 Windward progress reports," particularly where the CSE chairperson found this new information to be discrepant from the information available at the August meeting regarding S.N.'s level of need, including her report cards, which the SRO found "sufficient to determine [S.N.]'s functional performance." (*Id.*)

The SRO next found, based on a review of the hearing record, that "the [D]istrict's reliance on an erroneous psychoeducational evaluation and its failure to obtain input from Windward personnel[] constituted procedural errors." (*Id.*) After recounting the standards governing evaluations of a student with a disability and the subsequent consideration of such evaluations when developing a student's IEP, (*id.* at 12–13), the SRO analyzed the August 2015

18

CSE's consideration of S.N.'s evaluations, (*id.* at 13–17). First, the SRO noted that the "CSE undertook a[] historical review of [S.N.]'s performance across multiple years and multiple school settings," including the June 24, 2015 speech-language evaluation, the June 23, 2015 educational evaluation, the June 20, 2014 physical examination, the April/May 2013 private psychoeducational evaluation, and the August 27, 2014 neurophysical evaluation, which included a social history. (*Id.* at 13.) The SRO also noted that the IEP incorporated excerpts from S.N.'s 2014 and 2015 report cards. (*Id.*) Additionally, the SRO stated that the results of the 2015 psychological evaluation were "called into question" because of the scoring error. (*Id.* at 13–14.)

The SRO next described how the IEP "presented the findings of these evaluations in a manner that centered on [S.N.]'s academic achievement in reading, writing, and mathematics, intellectual functioning, and speech/language abilities," with additional assessment information relating to her social/emotional functioning. (*Id.* at 14.) With respect to academic skills, the IEP primarily relied on the June 2015 educational evaluation, containing S.N.'s Kaufman Test of Educational Achievement ("K-TEA") scores, which were below average in reading comprehension, nonsense word decoding, and decoding fluency. (*Id.*) The IEP also repeated the educational evaluation's finding of S.N.'s difficulty in responding to questions assessing influential comprehension, decoding words with a wide range of elements, and decoding nonsense words. (*Id.*) However, a quoted excerpt for S.N.'s 2014-15 Windward report card stated that S.N. "was decoding more accurately and reading with better fluency," and was benefiting from rereading. (*Id.*) The IEP also reported that S.N.'s K-TEA written language scores "fell within the average range," and the educational evaluation stated that she showed "strong skills" in punctuation and average skills in capitalization, word form and structure. (*Id.*)

And, S.N.'s Windward report card highlighted S.N.'s ability to compose a paragraph and her increased efforts to achieve "greater independence."  (*Id.*)

Turning to the IEP's depiction of S.N.'s math skills, the SRO found that the IEP "mirrored the results of [S.N.'s] performance on the K-TEA and were described as falling within the average range."  (*Id.* at 15.)  However, the IEP also explained that S.N.'s "ability to solve problems involving addition, subtraction, and measurement was less well developed" than her multiplication skills.  (*Id.*)  "The IEP also remarked on [S.N.]'s use of strategies to solve problems," including using drawings, internalizing math facts, repeated practice, use of manipulatives, and a math reference folder—all of which improved S.N.'s math skills as indicated on her Windward report card.  (*Id.*)

The SRO next observed that, although the IEP discussed the June 2015 psychological evaluation, "the accuracy of the results regarding [S.N.]'s functioning was compromised," because "her performance on the assessment was compared with that of a student who was ten years, six months," rather than her actual age—nine years, six months.  (*Id.*)  The SRO found that, "[d]ue to this error, the August 2015 IEP mischaracterized multiple aspects of [S.N.]'s performance.  (*Id.*)  Specifically, the IEP characterized S.N.'s performance on one subtest as "borderline" when it was actually "low average" when scored correctly, and in other instances, characterized S.N.'s performance as "low average" when they actually were "average."  (*Id.*)  Indeed, one initial classification was "average," but was actually "superior" when corrected.  (*Id.*)  However, despite these errors, the SRO noted that the August 2015 IEP also "carried over some [of] the evaluator's observations of [S.N.]'s behavior during the testing session," including her attention levels.  (*Id.*)

Next, the SRO described the IEP's delineation of S.N.'s results from the June 2015 speech-language evaluation.  (*Id.* at 15–16.)  This included an observation that S.N.'s performance on three separate tests "were all within the average range," but S.N. exhibited weakness with language processing of lengthy, complex information when not provided with cues or prompts.  (*Id.* at 15–16.)  "The IEP also echoed comments from the speech-language evaluation . . . that described [S.N.]'s use of metacognition and good attending skills," even amongst background noise.  (*Id.* at 16.)  The SRO noted, however, that the speech-language evaluator's assessment of S.N.'s behavior during testing "appears in conflict with the observations reported in the psychological evaluation report."  (*Id.* at 16 n.7.)

The SRO further analyzed the IEP's overview of S.N.'s strengths in metacognitive skills and self-advocacy when confronted with something she does not understand, and noted indications of "good work habits" and "good progress across all subjects" on S.N.'s 2014-15 Windward report card.  (*Id.*)  Furthermore, the IEP "noted parental concern regarding [S.N.]'s self-concept and anxiety as related to her 'learning difficulties.'"  (*Id.*)  However, after noting S.N.'s "average" scores on the Beck Self-Concept Inventory and S.N.'s "average levels of anxiety for her age," the IEP found that S.N. did not have any "social and emotional needs that should be addressed through special education" at the time of the August 2015 CSE meeting. (*Id.*)  The IEP noted, though, that S.N.'s self-concept would be "monitored."  (*Id.*)

The SRO also described the IEP's reliance on S.N.'s 2014-15 Windward report cards, which "provided an itemized list of discrete skills taught" at the school, as well as a "rubric for each subject that reflected [S.N.]'s progress across each marking period of the school year."  (*Id.* at 17.)  The report card also "provided insights regarding [S.N.'s] classroom behavior during academic and special area subjects," and "listed teacher ratings" for how frequently S.N.

"exhibited positive and prosocial school behaviors in each of her classes." (*Id.*)  The SRO noted

that "all ratings were ranked as either 'consistently' or 'frequently'"—the top two scores—

although "a few targeted behaviors were judged at the same level across all or most subjects,"

such as following single-step directions and using class materials appropriately.  (*Id.*)

The "CSE concluded that, based upon these assessments, [S.N.] demonstrated 'delays in

reading decoding, reading comprehension, and math calculation which inhibits progress in the

general education curriculum." (*Id.* at 17 (quoting SD Ex. 4 at 30).)  The SRO concluded that

"the hearing record provides no basis to depart from the IHO's determination that the failure to

obtain a classroom observation and the incorrect scoring of the cognitive testing on the June

2015 psychological evaluation constituted procedural violations." (*Id.*)  However, the SRO also

found that these procedural violations did not render S.N.'s IEP invalid under the Second Circuit

standard, which requires that "the violation affected the student's right to a FAPE, resulted in the

loss of educational opportunity, or seriously infringed on the parents' right to participate in the

IEP development process." (*Id.* at 17–19.)  Specifically, the SRO concluded that "the hearing

record establishes that the [D]istrict considered evaluative information that provided a

considerable amount of information regarding [S.N.'s] functioning," including, as the IHO

found, the 2014 private neuropsychological evaluation, and thus "failure to obtain a classroom

observation did not render [the CSE] unable to develop an appropriate program." (*Id.* at 18.)

The SRO rejected Plaintiffs' reliance on "the more supportive recommendation made by the

November 2015 CSE," because "the basis for that determination was information that went

beyond [S.N.'s] performance at Windward during the 2015-15 school year" and members of the

CSE found it "discrepant from their understanding of [S.N.'s] needs." (*Id.*)

Moreover, the SRO found that the hearing record "does not establish that any procedural violations in this matter, individually or cumulatively, resulted in a denial of a FAPE to [S.N.]." (*Id.*) Specifically, she noted that Plaintiffs' due process complaint did not challenge the IEP's present levels of performance, other than the "mild" disability characterization, nor did Plaintiffs appeal the IHO's determination that they were able to participate in the development of S.N.'s IEP. (*Id.*) Furthermore, the SRO reiterated that "the IEP reflected information from a variety of sources," and Plaintiffs "do not allege any specific harm caused by the inaccurate score" in the June 2015 psychological evaluation, "nor do they contend that the incorrect scoring" hindered their ability to participate in the CSE meeting. (*Id.*) Rather, the SRO explained, Plaintiffs "asserted that the [D]istrict failed to give sufficient credence to the recommendations of the private neuropsychological evaluation, an argument the IHO rejected." (*Id.*) Thus, the SRO rejected Plaintiffs' argument that the District lacked sufficient information regarding S.N.'s functional performance, because "the evaluative information available to the CSE, even if not meeting the procedural requirements for an initial evaluation, provided sufficient information . . . to develop her IEP." (*Id.* at 18–19.)

The SRO then addressed the substantive adequacy of the August 2015 IEP. (*Id.* at 19–22.) After reviewing the hearing record, the SRO agreed with the District that the IHO erred in finding that the IEP would not address S.N.'s needs and that S.N. required a greater level of support to be successful in a mainstream setting. (*Id.*) First, the SRO analyzed the recommended programs in the IEP—a resource room program in a 5:1 ratio in 45-minute sessions on five days out of a six-day cycle; consultant teacher services for 45 minutes one day out of a six-day cycle which are described as "work[ing] directly with the student to ensure generalizability of skills into the classroom with natural materials" and done in "consult[ation]

with the general education teacher"; and supplementary aids and services—and concluded that the record shows that "the CSE did . . . have adequate reason to believe that [S.N.] could be successful in a mainstream setting with the foregoing supports." (*Id.* at 19.) Next, the SRO addressed Sh. N.'s concern, voiced during the CSE meeting, that S.N. required a "small group setting." (*Id.*) The SRO recounted the testimony of the CSE chairperson that it was the "professional opinion" of District staff that S.N. had "more strengths than difficulties" and mostly "average skills," with only "very discrete areas that needed to be addressed." (*Id.*) To that end, the chairperson testified, and the IHO found, that the resource room would deliver such specialized instruction in S.N.'s areas of weakness, and the special education teacher leading the resource room would also provide the recommended consultant teacher services that would enable S.N. to ensure generalization of her skills in the general education setting. (*Id.* at 19–20.) Similarly, the SRO described the testimony of the District' special education teacher, who conducted the June 2015 educational evaluation, and who testified that the recommended program "would be appropriate to meet the student's needs" by providing her with instruction and practice to learn from and by implementing the majority of the work on S.N.'s annual goals in the resource room. (*Id.* at 20.) The chairperson and the special education teacher both testified that offering the resource room five out of six days was sufficient, because S.N. would still receive the additional program modifications and accommodations every day. (*Id.*)

The SRO also noted that the District's school psychologist testified that the IEP recommended program was sufficient, because "the Windward progress reports showed that [S.N.] had made progress with respect to academic skills" and reflected that S.N. was able to use and apply strategies provided to her with explicit instructions. (*Id.*) Similarly, the SRO cited the District speech-language pathologist's testimony that S.N.'s reading and math difficulties,

although below average, were "consistent with the types of kids that [the District] see[s] in a resource room," the IEP was appropriate for her, together with the other recommended modifications and accommodations in the general classroom. (*Id.*) In particular, the pathologist opined that S.N. required "some wait time" to answer questions, but she had "strong metacognitive skills." (*Id.*)

The SRO found that, contrary to the IHO's finding that there was "no discussion" at the CSE meeting about the impact of enrollment in a mainstream setting on S.N.'s distractibility and confidence level, the "record reveals inconsistent references to possible concerns in this domain." (*Id.*) Specifically, S.N.'s report card from the nonpublic general education school noted that S.N. "preferred clear expectations and asked for help at times when she felt 'unsure,'" and both the June 2013 classroom observation and the 2014 psychological evaluation noted S.N. was at times inattentive, hyperactive, or distracted, but the June 2015 speech-language pathologist reported that S.N. was attentive during a three-hour evaluation, even with background noise. (*Id.* at 20–21.) Therefore, the SRO concluded that "[s]uch discrepant observations challenge the predictive validity regarding how [S.N.] would react to enrollment in a mainstream classroom in the public school." (*Id.* at 21.)

Similarly, again based on a review of the hearing record, the SRO disagreed with the IHO's conclusion that "the CSE had no basis to believe [S.N.] would be able to make progress in a general education environment." (*Id.*) The SRO again noted that the CSE considered S.N.'s progress at the nonpublic general education school, including her second grade report card, which showed that S.N. "was progressing towards grade level expectations in all areas" within language arts subjects and was performing "at grade level in three of the four subskills" in math and "determined to be approaching grade level expectations" in another math category. (*Id.*)

The report card also noted S.N.'s struggles with phonemic awareness, decoding, and math facts, but stated that S.N.'s "literal and inferential comprehension would also improve" with growth in these skills and that S.N. was "persistent" in math.  (*Id.*)  Furthermore, the report card contained comments portraying S.N. "as having well-developed social skills," and "as being an active learner and frequent participant in literacy activities."  (*Id.*)

The SRO further noted that while Sh. N.'s testified that S.N. was "pulled out" of class for support due to "mild issues," as opposed to "major red flags," and was "falling behind a little bit in the curriculum in the classroom," the August 2014 neuropsychological evaluation indicates that Plaintiffs reported that S.N. had "struggled across several academic domains" and had "regressed so much" that she had become resistant to reading and writing activities.  (*Id.*)  Furthermore, the SRO addressed the psychologist's conclusion that S.N. "require[d] a small full time special education program" and that she would not be able to function effectively in a general education setting because she would not have enough time for word processing while reading, noting that there was "consistent testimony of the [D]istrict witnesses" that the extra time modification in the IEP "would be consistently implemented within the general education classroom," thereby "reveal[ing] the private psychologist's lack of familiarity with the [D]istrict public school programs."  (*Id.* at 21–22.)  Indeed, the SRO recounted the testimony of the regular education teacher, who claimed "there would be no difficulty in implementing" the IEP's modifications and accommodations, and the special education teacher, who also so testified and added that these recommendations "aligned with [S.N.'s] weaknesses as seen in the testing conducted in June 2015."  (*Id.* at 22.)  Similarly, the speech-language pathologist indicated that the IEP's recommendations could be implemented in the general education classroom and would address S.N.'s "subtle relative weaknesses" with language processing.  (*Id.*)  The CSE

26

chairperson and school psychologist also testified about how the recommended modifications would address S.N.'s specific areas of need and how they would operate in a general classroom environment.  (*Id.*)  Therefore, the SRO concluded that "the August 2015 CSE was in possession of adequate evaluative information regarding [S.N.]'s functional performance, and developed a program reasonably calculated to address [her] needs reflected by that evaluative information," and reversed the IHO's determination to the contrary.  (*Id.*)

Having reversed the IHO's finding that the District failed to offer S.N. a FAPE for the 2015-16 school year, the SRO did not reach the issue of whether Windward was an appropriate unilateral placement or whether equitable considerations support Plaintiffs' claim to reimbursement.  (*Id.*)

B.  Procedural History

Plaintiff commenced this Action by filing the Complaint on June 9, 2017.  (Compl.)  On July 25, 2017, Defendant filed a letter requesting that it not file a responsive pleading to the Complaint and instead that the Court schedule a pre-motion conference regarding a putative summary judgment motion.  (Letter from Mark C. Rushfield, Esq. to Court (July 25, 2016) (Dkt. No. 6).)  Defendant also suggested that Plaintiffs file the summary judgment motion, obviating the need for cross-motions for summary judgment.  (*Id.*)  Plaintiffs filed a letter consenting to Defendant's requests and further requesting that the Court "permit the [P]arties to dispense with the requirement of [Local] Rule 56.1 and allow the operative facts to be contained with the [P]arties' respective memoranda of law."  (Letter from Diana Gersten, Esq. to Court (July 26,

2016) (Dkt. No. 7).)  The Court granted these requests.  (Dkt. No. 8.)[6]  The Parties submitted a joint briefing schedule, (Dkt. No. 9), which the Court approved, (Dkt. No. 10).

On September 18, 2017, Plaintiffs filed the instant Motion for Summary Judgment and accompanying papers.  (Not. of Mot; Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Mem.") (Dkt. No. 12).)  Defendant filed its opposition and accompanying papers on November 1, 2017.  (Aff. of Mark C. Rushfield, Esq. in Opp'n to Mot. for Summ. J. (Dkt. No. 15); Mem. of Law in Opp'n to Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 16).)  Plaintiffs filed their reply on December 4, 2017.  (Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Reply") (Dkt. No. 19).)  On April 6, 2018, the Court ordered the Office of State Review of the New York State Department of Education to mail a copy of the certified record to Plaintiffs' counsel, who was subsequently ordered to provide a copy of that record to Defendant's counsel and to file a copy with the Court under seal pursuant to Federal Rule of Civil Procedure 5.2(d).  (Order (Dkt. No. 21).)  Plaintiffs filed the administrative record under seal on May 11, 2018.  (Dkt. No. 22.)

---

[6] Because the Court permitted the Parties to incorporate facts into their memoranda rather than file Rule 56.1 statements, the Court declines to consider the affirmation of defense counsel, which is not factual, is not based on personal knowledge, and instead presents further legal argument in an apparent attempt to evade the Court's page limitations.  (Aff. of Mark C. Rushfield, Esq. in Opp'n to Mot. for Summ. J. (Dkt. No. 15).)  *See Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) ("An affidavit of the opposing party's attorney which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight."); *Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 346 n.1 (E.D.N.Y. 1998) (noting that the "plaintiff's counsel's . . . affidavit is argumentative in the extreme and better characterized as a memorandum of law than an affirmation of facts within the personal knowledge of the affiant" and, because it was "submitted contemporaneously with a . . . memorandum of law, is a thinly-disguised attempt to circumvent this Court's page limits").

## II.  Discussion

### A.  Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public education"—a "FAPE," for short—to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A); *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 992–93 (2017) (same).  A FAPE "includes both 'special education' and 'related services,'" which a state must provide to a disabled child "'in conformity with the child's individualized education program,' or IEP."  *Endrew F.*, 137 S. Ct. at 994 (quoting § 1401(9)(D)) (alteration omitted).  "School districts, through a CSE, are responsible for formulating a written IEP for every qualifying child."  *L.O. v. New York City Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016) (footnote omitted); *see also* 20 U.S.C. § 1414(d) (same).[7]  "The IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *L.O.*, 822 F.3d at 102–03 (internal quotation marks omitted); *see also Endrew F.*, 137 S. Ct. at 994 (listing statutory criteria governing IEPs).

"The IDEA . . . requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 1001; *see also Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 757 (2d Cir. 2018) ("Prior decisions of this Court are consistent with the Supreme Court's decision in *Endrew F.*"); *L.O.*, 822 F.3d at 103 ("To comply with the provisions of the IDEA, the IEP must be reasonably

---

[7] "In New York, the state has assigned responsibility for developing IEPs to local CSEs. CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others."  *L.O.*, 822 F.3d at 102 n.4 (alteration, citations, and internal quotation marks omitted); *see also* N.Y. Educ. Law § 4402(1)(b)(1)(a)).

calculated to enable the child to receive educational benefits." (internal quotation marks

omitted)).  There is no "bright-line rule" determining "what 'appropriate' progress" means;

rather, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it

was created."  *Endrew F.*, 137 S. Ct. at 1001; *see also S.C. v. Katonah-Lewisboro Cent. Sch.*

*Dist.*, 175 F. Supp. 3d 237, 250 (S.D.N.Y. 2016) ("The IDEA does not itself articulate any

specific level of educational benefits that must be provided through an IEP." (internal quotation

marks omitted)), *aff'd sub nom. J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53 (2d Cir.

2017).  The Supreme Court recently explained that "[f]or children receiving instruction in the

regular classroom, this would generally require an IEP reasonably calculated to enable the child

to achieve passing marks and advance from grade to grade."  *Endrew F.*, 137 S. Ct. at 996

(internal quotation marks omitted).  But, for "a child who is not fully integrated in the regular

classroom and not able to achieve on grade level . . . his [or her] IEP . . . must be appropriately

ambitious in light of his [or her] circumstances."  *Id.* at 1000.  In other words, an IEP "providing

merely more than de minimis progress from year to year" is insufficient, *id.* at 1001 (italics and

internal quotation marks omitted), but, it also need not "furnish[] . . . every special service

necessary to maximize each handicapped child's potential," *Bd. of Educ. of Hendrick Hudson*

*Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 199 (1982), or "provide[] everything

that might be thought desirable by loving parents," *S.C.*, 175 F. Supp. 3d at 250.  Moreover,

"[b]ecause the law expresses a strong preference for children with disabilities to be educated, 'to

the maximum extent appropriate,' together with their non-disabled peers, special education and

related services must be provided in the least restrictive setting consistent with a child's needs,"

and "[o]nly 'when the nature or severity' of a child's disability is such 'that education in regular

classes with the use of supplementary aids and services cannot be achieved satisfactorily' should

a child be segregated." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)

(quoting 20 U.S.C. § 1412(5); *id.* § 1401(a)).

"[The] IDEA also provides a variety of procedural safeguards with respect to the

provision of [a FAPE] by school districts." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of*

*Educ.*, 397 F.3d 77, 81–82 (2d Cir. 2005) (internal quotation marks omitted); *see also* 20 U.S.C.

§ 1415 (listing safeguards). "[A]dequate compliance with the procedures prescribed would in

most cases assure much if not all of what Congress wished in the way of substantive content in

an IEP." *Rowley*, 458 U.S. at 206. On the other hand, not "every procedural error in the

development of an IEP renders that IEP legally inadequate under the IDEA," *A.C. ex rel. M.C. v.*

*Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009), although

"[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the

violations considered individually do not," *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d

Cir. 2012). Specifically, a procedural violation violates the IDEA only if it

> (I) impeded the child's right to a free appropriate public education;
> (II) significantly impeded the parents' opportunity to participate in the
> decisionmaking process regarding the provision of a free appropriate public
> education to the parents' child; or
> (III) caused a deprivation of educational benefits.

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525–26 (2007) (internal

quotation marks omitted).

In New York, if a parent believes that his or her child is being denied a FAPE, the parent

may request an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed

by a local school board, *see* N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed

to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be

31

challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A). *See also L.O.*, 822 F.3d at 103 (describing the appeal process).

### B.  Standard of Review

The Court's inquiry under the IDEA is limited to addressing (1) whether the District "complied with the procedures set forth in the Act" and (2) whether the IEP "developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07.  Unlike with an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010) (same), *aff'd*, 486 F. App'x 954 (2d Cir. 2012).  Instead, summary judgment in IDEA cases is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask*, 397 F.3d at 83 n.3 (internal quotation marks omitted); *see also G.B.*, 751 F. Supp. 2d at 570 (same).  The Court's review therefore "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete de novo review." *L.O.*, 822 F.3d at 108 (internal quotation marks and italics omitted). Accordingly, the Court must "engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012) (internal quotation marks omitted).

However, such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.  "To the contrary, federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the

specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.H.*, 685 F.3d at 240 (internal quotation marks omitted). However, to merit deference, the IHO's and SRO's decisions must be "thorough and careful." *S.C.*, 175 F. Supp.3d at 252 (internal quotation marks omitted). The quality of the decision can be judged on factors such as whether it is "well-reasoned" and "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189 (internal quotation marks omitted); *L.O.*, 822 F.3d at 109 ("To merit deference, the SRO's or IHO's factual findings must be reasoned and supported by the record." (alteration and internal quotation marks omitted)). Additionally, the Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when the district court's decision is based solely on the administrative record that was before the SRO. *See M.H.*, 685 F.3d at 244.

Where, as here, the IHO and SRO reach contrary conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* at 246; *see also A.C.*, 553 F.3d at 171 (noting that "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight," because the court must "defer to the final decision of the state authorities" (internal quotation marks omitted)). However, if the Court concludes that

> the SRO's determinations are insufficiently reasoned to merit . . . deference, and in
> particular where the SRO rejects a more thorough and carefully considered decision
> of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's

conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis.

*M.H.*, 685 F.3d at 246. Therefore, this Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189; *see also C.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, at *5 (S.D.N.Y. Jan. 3, 2013) ("[T]he Second Circuit [has] explained that the deference owed to an SRO's decision depends on the quality of that opinion, or its persuasiveness." (citation and internal quotation marks omitted)), *aff'd*, 552 F. App'x. 81 (2d Cir. 2014).

### C.  Analysis

Plaintiffs argue that Defendant failed to provide S.N. with a FAPE for the 2015-16 school year for several reasons. The gravamen of their position is that the District waited to begin its evaluation of S.N. until signing the stipulation of settlement for the previous year, resulting in rushed evaluations producing erroneous scores and a failure to obtain information regarding how S.N. would function in a general education classroom, including through classroom observation and speaking with Windward teachers. (Pls.' Mem. 16–18.) Plaintiffs therefore argue that S.N.'s August 2015 IEP was both procedurally and substantively deficient. (*Id.*)

#### 1.  Exhaustion

As a threshold matter, Defendant argues that the Court lacks subject matter jurisdiction over some of Plaintiffs' claims because Plaintiffs failed to cross-appeal them to the SRO. (Def's Mem. 12.) Specifically, Plaintiffs did not cross-appeal the IHO's findings that the characterization of S.N.'s disability as "mild" did not affect her recommended IEP, (IHO Decision 18), and that the District reviewed Dr. Tagliareni's recommendations in her neuropsychological report, even if it did not adopt them, (*id.* at 19). (Def.'s Mem. 12). The SRO

therefore concluded that the IHO's findings on these issues "have become final and binding on the [P]arties."  (SRO Decision 11.)[8]

It is true that "an IHO's decision is 'binding' upon the parties absent an appeal to the SRO."  *D.N. v. New York City Dep't of Educ.*, 905 F. Supp. 2d 582, 587 (S.D.N.Y. 2012) (quoting N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 8, § 20.5(j)(5)(v)); *see also C.H. v. Goshen Cent. Sch. Dist.*, No. 11-CV-6933, 2013 WL 1285387, at *9 (S.D.N.Y. Mar. 28, 2013) ("[I]ssues that were decided by the IHO and not appealed or cross-appealed by the party against which they were decided are binding against that party, and on the SRO and th[e] [c]ourt, as to that party.").  "However, it does not necessarily follow that a party who does not cross-appeal a favorable IHO decision is precluded from asserting alternative grounds upon which a reviewing court might sustain or reinstate the IHO's judgment."  *D.N.*, 905 F. Supp. 2d at 587.  Indeed, only a "party *aggrieved* by the findings and decision rendered in [an impartial] hearing may appeal such findings and decision to [the SRO]."  20 U.S.C. § 1415(g) (emphasis added); 8 N.Y.C.R.R. § 200.5(k)(1) (same).  Plaintiffs were not "aggrieved" by the IHO's decision; rather, they prevailed at the impartial hearing, where the IHO agreed that S.N. was denied a FAPE for the 2015-16 school year and ordered the District to reimburse Plaintiffs for that year of Windward tuition.  (IHO Decision 21, 26.)  That Plaintiffs disagreed with some of the IHO's reasoning does not change the result; thus, there was nothing for Plaintiffs to appeal.  *See D.N.*,

---

[8] To the extent Defendant also believes other claims were unexhausted, it fails to identify them in this labeled portion of its counseled brief.  (Def's Mem. 12.)  *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) ("[The plaintiff] failed to . . . raise this argument in his opposition to summary judgment. Thus, this argument has been waived."); *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("Perhaps counsel for [the] [a]ppellant intends that we form an argument for him, by looking into the record to document the 'facts' posited in his 'statement of the case,' and then examining various combinations of these facts in the light of the legal doctrines he later mentions.  But that is simply not our job, at least in a counseled case.").

905 F. Supp. 2d at 588 (finding that a parent who "received precisely the relief she sought: reimbursement for the [s]tudent's unilateral placement at" a private school, "was not aggrieved, and she 'had neither the responsibility nor the right' to cross-appeal any portions of the IHO's decision" (quoting *Antkowiak by Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir. 1988)); *R.B. ex rel. L.B. v. Bd. of Educ. of City of New York*, 99 F. Supp. 2d 411, 415–16 (S.D.N.Y. 2000) (holding that the "[p]laintiff was not required to appeal the hearing officer's decision" because she "prevailed at the impartial hearing" and received the relief requested, even though the defendant argued that "she did not entirely agree with the decision of the hearing officer"). Therefore, the Court does not lack jurisdiction and will consider these arguments as potential alternate grounds for reversing the SRO's decision and upholding the IHO's decision.

### 2.  Procedural Adequacy

Plaintiffs argue that Defendant committed procedural violations in formulating S.N.'s August 2015 IEP which rendered it substantively inadequate.  (Pls.' Mem. 19–23.)  Specifically, they contend that the evaluative information before the CSE was insufficient, because the CSE (1) relied on Dr. Greenwell's incorrectly scored psychoeducational evaluation; (2) ignored Dr. Tagliareni's private neuropsychological evaluation; and (3) did not conduct a required classroom observation.  (*Id.*)

When developing a student's IEP, a CSE must review "existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related service providers."  20 U.S.C. § 1414(c)(1)(A).  This includes "the results of the initial evaluation or most recent evaluation of the child," *id.* § 1414(d)(3)(A)(iii), and any independent educational evaluation obtained at a parent's expense,

*see* 34 C.F.R. § 300.502(c).  "[O]n the basis of that review, and input from the child's parents,"

the CSE must then "identify what additional data, if any, are needed to determine," among other

things, "the educational needs of the child," "the present levels of academic achievement and

related developmental needs of the child," "whether the child needs special education and related

services," and "whether any additions or modifications to the special education and related

services are needed to enable the child to meet the measurable annual goals set out in the [IEP]

. . . and to participate, as appropriate, in the general education curriculum."  20 U.S.C.

§ 1414(c)(1)(B).  "The CSE has the discretion to determine that no new evaluation is required."

*D.M. v. City Sch. Dist. of the City of New York*, No. 15-CV-1619, 2016 WL 319859, at *5

(S.D.N.Y. Jan. 26, 2016); *see also* 20 U.S.C. § 1414(c)(4)(B) (stating that if the CSE

"determine[s] that no additional data are needed . . . to determine the child's educational needs,

the [CSE] . . . shall not be required to conduct such an assessment unless requested by the child's

parents").  "In other words, any additional assessments need only be conducted if found

necessary to fill in gaps in the initial review of existing evaluation data."  *C.R. v. New York City

Dep't of Educ.*, 211 F. Supp. 3d 583, 607 (S.D.N.Y. 2016) (alteration and internal quotation

marks omitted).  "Unless the CSE identifies such a 'gap,' or the parents and district agree

otherwise, the IDEA requires only that a child with a disability be evaluated at least once every

three years, and not more frequently than once a year."  *Id.*  (citing 20 U.S.C. § 1414(a)(2)(B);

8 N.Y.C.R.R. § 200.4(b)(4)).

   With these background rules in mind, the Court will address each purported procedural

violation separately, as well as their cumulative effect.

### a.  Incorrect Psychoeducational Evaluation

Plaintiffs *first argue* that the August IEP was invalid because it was based upon Dr. Greenwell's incorrectly scored psychoeducational evaluation, which was not re-scored until after the 2015-16 school year began.  (Pls.' Mem. 19–22.)  The SRO agreed with the IHO that the District's reliance on Dr. Greenwell's erroneous report was a procedural error.  (SRO Decision 12, 17; IHO Decision 17.)  Specifically, the SRO noted that, because S.N.'s performance was compared with a student who was one year older than her—that is, ten years, six months rather than nine years, six months—"the August 2015 IEP mischaracterized multiple aspects of [her] performance."  (SRO Decision 15.)  These aspects included misidentifying her performance on one subtest as "borderline" when it was actually "low average," and other scores as "low average" when they were actually "average" and, in one case, an "average" score was actually "superior."  (*Id.*; *compare* Pl.'s Ex. M (original report) *with* SD Ex. 18 (revised report).)  However, the SRO concluded that these errors did not render S.N.'s IEP invalid, because "the IEP reflected information from a variety of sources," and Plaintiffs "do not allege any specific harm caused by the inaccurate scores," "nor do they contend that the incorrect scoring" hindered their ability to participate in the CSE meeting.  (SRO Decision 18.)  The Court agrees.

A New York regulation governing formulation of IEPs requires that "evaluation materials used to assess a student . . . are used for purposes for which the assessments or measures are valid and reliable" and "are administered by trained and knowledgeable personnel." 8 N.Y.C.R.R. § 200.4(b)(6)(i)(b), (c).  Citing this provision, Plaintiffs argue that "[a]n IEP that is based upon erroneous test scores cannot be considered valid."  (Pls.' Mem. 19.)  Plaintiffs cite no cases applying this regulation, and the Court was unable to find any.  In any event, Defendant does not contest that the scores were erroneous and improperly considered in the IEP.  That

proposition alone, however, does not mean that recitation of these scores in the IEP rendered it substantively inadequate or that the District was required to conduct a new evaluation prior to formulating the IEP.  As the SRO noted, Plaintiffs do not identify what harm was caused by the inclusion of these scores in the IEP.  (SRO Decision 18.)  Plaintiffs do not argue, for example, that Dr. Greenwell reported one of the erroneous scores as *higher* than it should have been, causing the IEP to recommend diminished or no educational support in that testing area.  Nor could they, in light of the evidence in the record that, when recalculated correctly, S.N.'s scores in many areas went *up*.  (*Compare* Pls.' Ex. M (original report) *with* SD Ex. 18 (revised report) (showing increase in General Intellectual Ability score, Comprehension-Knowledge standard score, Thinking Ability score, Visual Auditory learning, Retrieval Fluency, Visual-Spatial Thinking, Picture Recognition, Auditory Processing, Fluid reasoning, Cognitive Efficiency Processing Speed, Short-Term Memory, Working Memory); *see also* Tr. 271–74 (Dr. Greenwell testifying that the change "resulted in . . . a slight increase in [S.N.'s] standard scores in each of [the] areas that were assessed" but that S.N.'s cognitive "profile of strengths and weaknesses remained consistent"); *id.* at 781–84 (Dr. Tagliareni testifying that the changed scores "are statistically significantly different" and "describing a very different child in terms of cognitive potential and intellectual functioning," but identifying places where S.N.'s scores improved to support that interpretation); SD Ex. 5 at 37 (noting in November 2015 CSE minutes that S.N.'s scores "improved").  In other words, the initial results *overstated* S.N.'s difficulties, because they were comparing her scores to a child a year older than her, and thus an IEP based on those scores should have recommended *more* intensive, not less intensive, educational programming.

Plaintiffs argue that Defendant may not rely on the fact that S.N.'s scores improved, because it cannot use "retrospective testimony" to rehabilitate an otherwise invalid IEP.  (Pls.'

Mem. 19–21.)  However, the cited cases are inapposite.  In *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d Cir. 2012), the Second Circuit held that a defendant may not use "retrospective testimony"—that is, "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement"—to later amend or rehabilitate a deficient IEP.  *Id.* at 185.  Instead, the Second Circuit limited appropriate retrospective testimony to "testimony regarding the services described in the [IEP]," *id.* at 174, excluding "additional services beyond those listed in the IEP," *id.* at 186.  The reason for this decision, the Second Circuit explained, is that

> parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision.  At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on, and therefore the adequacy of the IEP itself creates considerable reliance interests for the parents.  Under the Department [of Education]'s view, a school district could create an IEP that was materially defective, causing the parents to justifiably effect a private placement, and then defeat the parents' reimbursement claim at a [impartial hearing] with evidence that effectively amends or fixes the IEP by showing that the child would, in practice, have received the missing services.  The Department's view is incorrect.  By requiring school districts to put their efforts into creating adequate IEPs at the outset, IDEA prevents a school district from effecting this type of "bait and switch," even if the baiting is done unintentionally.  A school district cannot rehabilitate a deficient IEP after the fact.

*Id.* at 186.  The Second Circuit reaffirmed the bar on retrospective testimony in *Reyes ex rel R.P v. New York City Department of Education*, when it held that an "SRO's reliance on testimony that [an] IEP could be modified to extend [a] paraprofessional's services was improper under *R.E.*"  760 F.3d 211, 220 (2d Cir. 2014).  Again, the Second Circuit explained that "[i]f [a] school district were permitted to rely on the possibility of subsequent modifications to defend the IEP as originally drafted, then it could defeat any challenge to any IEP by hypothesizing about what amendments could have taken place over the course of a year," which "would create

significant uncertainty" for parents evaluating "what special education and related services the child would actually receive" before deciding what school to place them in.  *Id.* at 220–21.

Simply put, Defendant is not offering, and the SRO did not rely on, such impermissible retrospective testimony here.  *See M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 142–43 (2d Cir. 2013) (rejecting argument that the SRO "relied upon impermissible retrospective justifications to fill in the IEP's inadequacies" because the defendant "admit[ted] there was" a procedural violation, and "the SRO did not rely upon a promise not contained in the IEP to address the omission").  Defendant is not arguing that the IEP includes additional services not listed, or even that it relied on other evaluative materials not listed.  Nor is Defendant arguing that the revised IEP in November 2015 "cured" the procedural defect in the August 2015 IEP. Rather, Defendant argues, and the SRO found, that the CSE relied on several sources of evaluative information about S.N.'s functioning in fashioning her IEP, and that the inclusion of the incorrect scores from Dr. Greenwell's report, which actually overstated S.N.'s functional limitations, did not render the IEP substantively insufficient.  (*E.g.*, Tr. 77–79 (Snider testifying that Dr. Greenwell's "scores were incorrect" but that the CSE considered other psychological evaluations, and "[p]utting it altogether" the CSE got a "nice cognitive profile" of S.N.); *id.* at 334 (Dr. Greenwell testifying that "I don't believe that our understanding of who S.[N.] was as a learner was influenced significantly by these slight changes in scores because we also were taking into consideration the two private evaluations"); *id.* at 338 (Greenwell testifying that S.N.'s strength in processing speed and weakness in memory and working memory "was consistent between the two [CSE] meetings," it was "just that the percentiles changed").  *See M.W.*, 725 F.3d at 143 ("When the IEP suffers from a conceded procedural infirmity, we first review whether that procedural violation substantively deprived the student of a FAPE before

determining whether the SRO corrected the substantive failure by impermissibly crediting future promises.")  Plaintiffs cite no case holding otherwise.[9]  Nor did the IHO provide a rationale or supporting caselaw for her finding that the rescoring of Dr. Greenwell's report "needed to have been done prior to making the recommendation" for S.N.'s IEP.  (IHO Decision 17.)  *See T.F. v. N.Y.C. Dep't of Educ.*, No. 14-CV-3401, 2015 WL 5610769, at *4 (S.D.N.Y. Sept. 23, 2015) ("[T]he CSE is not required to conduct updated evaluations where it has sufficient evaluative materials reflecting the student's present level of performance.").

Plaintiffs also suggest that the IEP was invalid because Dr. Greenwell's evaluation relied on "age-driven assessments," so the use of an incorrect birth year rendered the resulting data inaccurate.  (Pls.' Mem. 21.)  They cite Dr. Tagliareni's testimony, as did the IHO, (IHO Decision 17), that the original Dr. Greenwell evaluation and the corrected one "are statistically significantly different," (Tr. 781).  However, contrary to Plaintiffs' assertion that this testimony showed "a greater disparity in S.N.'s deficits" from rescoring, (Pls.' Mem. 21), Dr. Tagliareni testified that the two IQ tests were "probably" calculated with different birthdates, which "describe[e] a very different child in terms of cognitive potential and intellectual functioning." (Tr. 782.)  She went on to explain that "*if* there were programs or any kind of recommendations based upon the incorrect birthdate," discrepancies between Plaintiff's potential, based on her IQ, and her test performance, "would not be as large as the discrepancies with the corrected birthdate."  (*Id.* at 783–84 (emphasis added).)  Put differently, if S.N. was actually an "average" child but performed "low average" on a test, the discrepancy would be larger than if she was

---

[9] Plaintiffs also assert that Defendant is incorrect, because the revised IEP's recommended program was more restrictive, indicating that the incorrect scores *did* affect the recommendations in the August IEP.  (Pls.' Mem. 20 n.8.)  However, the record shows that these changes were made because of new input from S.N.'s Windward instructors, not the rescoring of Dr. Greenwell's report.  (SD Ex. 5 at 37; Tr. 115–16, 194, 309–12, 563.)

considered below average and performed concomitantly in the low average range. (*Id.*) This testimony, however, does not identify *what* recommendations in the IEP were affected by such a potential discrepancy. In fact, it is not clear such a discrepancy existed, because Plaintiffs cite no evidence suggesting S.N. had an "average" IQ but performed "low average" on a particular test once Dr. Greenwell's evaluation was rescored. (*Cf.* Tr. 272 (Dr. Greenwell testifying that S.N.'s "cognitive profile that was indicated by both reports was a similar profile[,] [s]o the profile of strengths and weaknesses remained consistent, just there were slight increases in the scores"); *id.* at 339 (Dr. Greenwell testifying that knowing the variability in S.N.'s IQ scoring, she "still believe[d]" that S.N. had "a mild disability").)

In any event, as described above, the SRO conducted an exhaustive review of the evaluative materials before the CSE and concluded that there was sufficient information about S.N.'s functioning to craft an adequate IEP. (SRO Decision 16–19.) Plaintiffs do not contest this finding, and instead argue only that the CSE did rely on Dr. Greenwell's evaluation and it was not corrected until after they had to decide where to place S.N. for the 2015-16 year. (Pls.' Reply 2–3.) But, these facts are not tied to any specific recommendation in the IEP or to Plaintiffs' decision to enroll S.N. at Windward. Thus, in light of the SRO's well-reasoned opinion and Plaintiffs' failure to identify a specific way in which Dr. Greenwell's incorrect scoring affected the recommendations in S.N.'s IEP, deprived her of educational benefits, or somehow impeded Plaintiffs' opportunity to participate in the decisionmaking process, the Court agrees with the SRO that this procedural violation alone did not deny S.N. a FAPE for the 2015-16 year. *See Winkelman*, 550 U.S. at 525–26 (describing when a procedural violation violates the IDEA); *L.O.*, 822 F.3d at 109 ("[P]arents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." (internal quotation

marks omitted)); *R.C. ex rel. N.C. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, No. 07-CV-2806, 2008 WL 9731053, at *13 (S.D.N.Y. Mar. 6, 2008) (holding that "purportedly false test scores" did not render the IEP inadequate because the CSE addressed the student's deficits through other means), *adopted*, 2008 WL 9731174 (S.D.N.Y. July 7, 2008).

### b.  Dr. Tagliareni's Evaluation

Plaintiffs also argue that because Dr. Greenwell's evaluation was unreliable, Dr. Tagliareni's evaluation, including her recommendation for a full-time special education program, was "the only legitimate psychoeducational recommendation upon which [the CSE] could rely."  (Pls.' Mem. 21; *see also id.* at 17 (same); Pls.' Reply 3 (same).)  The SRO found that the CSE specifically reviewed Dr. Tagliareni's 2014 evaluation, including the incorporated social history, when it conducted a "historical review of [S.N.'s] performance across multiple years and multiple school settings."  (SRO Decision 13.)  However, the SRO rejected Plaintiffs' contention that "the [D]istrict failed to give sufficient credence to the recommendations of" Dr. Tagliareni—"an argument the IHO [also] rejected"—and instead concluded that "the evaluative information available to the CSE . . . provided sufficient information . . . to develop her IEP." (*Id.* at 18–19; *see also* IHO Decision 19 (crediting Snider's testimony that the CSE reviewed Dr. Tagliareni's evaluation, and explaining "[t]he fact that [the] [D]istrict did not adopt Dr. Tagliareni's recommendations does not mean [her report] was not given due consideration")).) The Court agrees with the SRO and the IHO that the CSE's treatment of Dr. Tagliareni's report did not constitute a procedural violation.

The IDEA "requires that a CSE actually review evaluative data and base the terms of the student's IEP on that information."  *L.O.*, 822 F.3d at 110–11.  This includes an independent educational evaluation obtained by a parent "at private expense."  34 C.F.R. § 300.502(c).  It is

Defendant's burden "to demonstrate which evaluative materials were reviewed during [the] CSE meeting in reaching the terms of the IEP[]." *L.O.*, 822 F.3d at 110.  The IEP explicitly states that "[a]ll evaluations were reviewed[,] including the private psychoeducational evaluation which was completed in August of 2014."  (SD Ex. 4 at 24; *see also id.* at 26.)  This is corroborated by Snider's testimony, which the IHO credited.  (Tr. 171–72.)  Furthermore, for each description of S.N.'s functional performance and learning characteristics, the CSE cited the test or evaluation on which it was basing its description.  (S.D. Ex. 4 at 28–30.)  In the meeting minutes, the CSE noted that Sh.N. "wonder[ed] whether [S.N.] needs a small class setting all day like Windward," but the CSE explained that such a program "would be overly restrictive" in light of S.N.'s "mild disability."  (*Id.* at 25.)  Plaintiffs cite nothing in the record contradicting this evidence or otherwise showing that the CSE ignored Dr. Tagliareni's evaluation.  *See D.M.*, 2016 WL 319859, at *6 (rejecting as "factually incorrect" the plaintiffs' argument that the CSE did not consider an evaluation, based on testimony and the parties joint statement of acts); *cf. L.O.*, 822 F.3d at 110 (explaining that it is a procedural violation when a CSE "fail[s] to memorialize how it reached the terms of the IEPs," leaving "reviewing authorities and courts . . . to speculate . . . later as to how the CSE reached the terms of the child's IEP"); *S.Y. v. N.Y.C. Dep't of Educ.*, 210 F. Supp. 3d 556, 573 (S.D.N.Y. 2016) (finding that the defendant failed to satisfy its burden of proof because it "offered no evidence to substantiate its claim that the CSE gave due consideration to an 8:1:3 classroom").

Ultimately, Plaintiffs are arguing that the CSE did not adopt, or at least give enough credence to, Dr. Tagliareni's recommendation.  However, the CSE was not required to do so, and therefore, this cannot establish a procedural violation of the IDEA.  *See M.B. v. N.Y.C. Dep't of Educ.*, No. 14-CV-3455, 2017 WL 384352, at *6 (S.D.N.Y. Jan. 25, 2017) (finding no

procedural violation because the CSE did consider the evaluation in question and because it was not "required to defer to the recommendations and evaluations proffered by the parents"); *S.W. v. New York Dep't of Educ.*, 92 F. Supp. 3d 143, 158 (S.D.N.Y. 2015) ("Consideration does not require substantive discussion, that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight." (citing *T.S. v. Bd. of Educ. of Town of Ridgefield*, 10 F.3d 87, 89–90 (2d Cir. 1993)). [10]   The CSE and hearing officers were not required to accept Dr. Tagliareni's recommendation merely because she is a private expert. *See G.W. v. Rye City Sch. Dist.*, No. 11-CV-8208, 2013 WL 1286154, at \*19 (S.D.N.Y. Mar. 29, 2013) ("The Court is not at liberty to favor Dr. Scalzo's opinion, a privately hired expert, over the deference that should appropriately be accorded to the District in matters of educational policy."), *aff'd*, 554 F. App'x 56 (2d Cir. 2014); *McCallion v. Mamaroneck Union Free Sch. Dist.*, No. 10-CV-6207, 2013 WL 237846, at \*10 (S.D.N.Y. Jan. 22, 2013) (rejecting argument that "the SRO erred by relying too heavily on the evaluations and opinions of the District's witnesses while giving little or no weight to the conclusions of Parent's experts" because the court defers to the district, not to a private expert); *Watson ex rel. Watson v. Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004) ("The mere fact that a separately hired expert has recommended different programming does nothing to change this [outcome], as deference is paid to the District, not a third party.") *aff'd*, 142 F. App'x 9 (2d Cir. 2005).   The Court may not choose to adopt Dr. Tagliareni's views instead of the CSE's and therefore overturn the decision of the SRO, which was the same as that of the IHO on this issue. *See T.Y. v. N.Y.C. Dep't of*

---

[10] Although not necessary to the Court's decision, it is noteworthy that the August 2015 IEP incorporates Dr. Tagliareni's recommendations for organization and classroom modifications and aids—such as special seating, instructor monitoring of comprehension, prompting, and extra time—as well as her observations about S.N.'s weaknesses in reading skills and mathematics.  (*Compare* SD Ex. 13 at 95–97 *with id.* Ex. 4 at 31–33.)

*Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (noting that a district court may not "impermissibly ch[o]ose between the views of conflicting experts on a controversial issue of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence" (alteration and internal quotation marks omitted)); *see also J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53, 55 (2d Cir. 2017) ("The SRO was not required to automatically accept the neuropsychologists' recommendations as to class size, but he was required to consider the recommendations and, if he rejected them, to convincingly explain why.").

### c.  Classroom Observation

Plaintiffs also argue that the CSE failed to conduct a classroom observation of S.N. or consult Windward staff. (Pls.' Mem. 22–23.)  The SRO agreed with the IHO that this constituted a procedural violation.  (SRO Decision 17.)  However, the SRO concluded, after extensively discussing the evaluations before the CSE, that "the hearing record establishes that the [D]istrict considered evaluative information that provided a considerable amount of information regarding [S.N.'s] functioning," and thus "failure to obtain a classroom observation did not render [the CSE] unable to develop an appropriate program."  (*Id.* at 18.)  By contrast, the IHO found that the failure to conduct a classroom observation rendered the IEP substantively inadequate, because the IHO lacked information about S.N.'s functioning at Windward that would help determine whether she was ready for a transition to a general education setting.  (IHO Decision 15–16, 20–21.)  In so concluding, the IHO relied on the fact that the CSE modified S.N.'s IEP to be more restrictive after receiving input from Windward staff.  (*Id.* at 16, 21.)

Plaintiffs urge the Court to adopt the IHO's view, because a classroom observation or input from S.N.'s teachers was necessary to evaluate S.N.'s performance in a general education setting.  (Pls.' Mem. 22–23.)  Plaintiffs do not challenge anything specific in the IEP's

description of S.N.'s then-present levels of performance.  (SD Ex. 4 at 26–31.)  This description

was based upon S.N.'s test scores, observations during her various evaluations spanning from

2014 through 2015, and report cards from 2013, 2014, and 2015.  (*Id.*)  In S.N.'s report cards

from Solomon Schechter, she received no "below grade level expectations" marks; rather, as of

the end of the first semester of second grade, she was performing consistently in study habits and

meeting grade level expectations in all science and math areas except "know[ing] math facts to

20," and "progressing toward grade level expectations" in the latter subcategory and all language

arts categories.  (SD Ex. 17 at 121.)  Her teacher observed that S.N. was engaged in class and

"able to follow all classroom routines," but she "often hesitates before moving forward on a task

with confidence" and "sometimes need[s] additional clarification of directions" and "appreciates

clear expectations."  (*Id.*)  S.N. also "benefits from an additional check-in after directions are

given."  (*Id.*)  The report card further observes that S.N. "struggles with phonemic awareness and

decoding," but the teacher believed "that as these skills continue to develop so will her literal and

inferential comprehension."  (*Id.*)  Furthermore, S.N.'s "written expression is simplistic,

although her ability to expand her sentences is increasing."  As to math, the report card noted

that S.N. "does not yet have automatic recall of her math facts," undermining her "flexibility and

confidence" in new math concepts, and "[h]er ability to understand, retain, and apply math

concepts and skills is weak," but she "benefits from small group work and frequent

reinforcement" and still "participates eagerly during math class."  (*Id.* at 121–22.)  As for S.N.'s

Windward progress report from the 2014-15 school year, the instructor observed that S.N.'s

decoding accuracy continued to improve in both the third and fourth quarters, as did her reading

fluency, although she still faced difficulty with inferential material and benefited from rereading.

(*Id.* at 130–31.)  Moreover, the report noted that S.N. continued to make progress in applying

writing and spelling strategies taught to her, and was continuously more independent in her writing.  (*Id.* at 131.)  In the fourth quarter, S.N. received only a limited number of scores of 3 (for "occasionally") and 4 (for "rarely") as relevant here: decoding vowel teams, identifying and correcting run-on sentences, generating topic sentences, using transition words and phrases, revising written work, editing for fragments and run-ons, solving word, money word, time word, multiplication word, division word, measurement, geometry, and probability word problems by using an appropriate strategy, multiplying whole numbers, comparing and ordering fractions, determining equivalent fractions,  collecting and recording data, identifying various geometric figures, writing predictions for outcomes of events.  (*Id.* at 127–138.)  The rest of her scores were "consistent[]" or "frequent[]."  (*Id.*)

The CSE reviewed these report cards "in detail" and found it "clear again that there were very specific areas of need, and that most of the majority of the scores were either . . . around grade level or above."  (Tr. 196.)  Therefore, the CSE deemed that S.N. had more strengths than weaknesses and had only discrete areas of need, as opposed to a severe disability requiring intensive special education services.  (*Id.* at 93–94; SD Ex. 4 at 25.)  Plaintiffs argue that the CSE's reliance on the Solomon Schechter report cards was inappropriate because they "did not reflect [S.N.'s] *present* levels of performance or present ability to function in a classroom." (Pls.' Reply 4 n.3.)  However, these reports do support the CSE's interpretation that S.N. benefits from targeted instruction and skill building in a general education setting, and that she has discrete areas of weaknesses rather than overarching problems precluding her progress in the classroom.  Contrary to Plaintiffs' assertion, (*id.*), the portion of S.N.'s first grade report card recommending "continued support and intervention" at a general education school, does not undermine this conclusion, (SD Ex. 17 at 123).  In fact, while Plaintiffs' objection to the

relevance of these old report cards could be persuasive if the CSE did not rely on other, more recent evaluative materials, that is not what occurred here.  (*See* SD Ex 4 at 26.)  Similarly, Plaintiffs argue that Defendant erred in relying on S.N.'s Windward progress report, because it "*only* reflected S.N.'s performance in a specialized setting" rather than a general education setting.  (Pls.' Reply 3.)  But, again, these scores show that S.N. progresses with targeted instruction, that she already operates at an average or grade-appropriate level in many areas, and that she has only specific weaknesses.  Indeed, McNamara testified that, the Windward report card showed that "when [S.N.] was directly instructed on a skill and she had time to practice it, she was able to master it in most cases based on the one through four reporting system."  (Tr. 539; *see also* SRO Decision 13 (noting that "[w]hen a student has not been attending public school, it is also appropriate for the CSE to rely on the assessments, classroom observations, or teacher reports provided by the student's nonpublic school").)  Plaintiffs cite nothing in the report card tying S.N.'s progress to any specific intervention strategy used at Windward, or even an area of difficulty, that the CSE failed to carry over into her IEP for 2015-16 school year.[11]

Instead, after conducting an extensive analysis of the various evaluative materials considered by the CSE, the SRO concluded that the failure to conduct a classroom observation did not render the IEP substantively inadequate or otherwise deny S.N. a FAPE.  (SRO Decision at 18–19.)  Rather than contest the adequacy of the other materials before the CSE, Plaintiffs point to the fact that the CSE reconvened to intensify S.N.'s IEP in light of new information from Windward.  (Pls.' Mem. 23.)  However, the SRO found, and Plaintiffs do not contest, that

_____

[11] Plaintiffs also argue that because the District described the Windward progress reports as "vague and unreliable" in arguing that Windward was not an appropriate unilateral placement, the reports could not be used to justify the IEP recommendation.  (Pls.' Mem. 18; SRO Decision 8.)  However, the IHO disagreed, and the SRO did not reach, let alone disrupt, that finding.  (IHO Decision 19.)

this new information was about S.N.'s performance during the *2015-16* school year, not the

2014-15 school year, and thus changes based upon this new information do not mean that the

August 2015 IEP was incorrect in its analysis of S.N.'s previous performance in the 2014-15

school year.  (SRO Decision 12.)  The Court agrees with this assessment of the record,

particularly in light of Plaintiffs' failure to cite any contrary evidence in the record.  The

November 2015 CSE minutes state that Windward representatives "gave feedback on the

student's performance in school *this year*," which Sh. N., present at the meeting, agreed with.

(SD Ex. 5 at 37.)  The CSE then had a "discussion about [S.N.] needing more support given the

updated information," and decided to switch to integrated co-teaching 4 hours daily and a

resource room, in addition to adding new math and writing goals in the IEP.  (*Id.*; *see also* Tr.

115–16, 309–12, 563 (testifying that such changes were warranted by the statements of

Windward staff).)[12]  Nothing about this new information rendered the existing information

before the August 2015 IEP so insufficient that the IEP denied S.N. a FAPE.  Indeed, it is telling

that neither Plaintiffs nor the IHO cite any cases holding that the failure to conduct a classroom

observation alone renders an IEP substantively void.  Therefore, while the CSE could have been

more thorough in conducting a classroom observation of S.N. at Windward before crafting her

2015-16 IEP, the Court defers to the SRO's well-reasoned decision that this did not deny S.N. a

---

[12] "[I]integrated co-teaching services . . . [are] a placement somewhere in between a regular classroom and a segregated, special education classroom."  *M.W.*, 725 F.3d at 144; *see also* 8 N.Y.C.R.R. § 200.6(g) ("Integrated co-teaching services means the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students.").  Plaintiffs do not explain, let alone cite anything in the record showing, how these services are so dramatically different than the original consultant teacher services provided in the August 2015 IEP such that the Court could understand how much more severe the November 2015 IEP recommendation is.  (*See* SD Ex. 4 at 24.)  But, it is noteworthy that even these services are not the full, immersive special education program that Dr. Tagliareni suggested.

FAPE.  *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 169 (2d Cir. 2014)

(holding that the SRO's decision that the school did not deny the student a FAPE for failing to

conduct an evaluation turned on "fact-specific educational questions [that] are precisely the type

of issue upon which the IDEA requires deference to the expertise of the administrative officers"

(internal quotation marks omitted)); *S.Y.*, 210 F. Supp. 3d at 567 (finding a procedural violation

from the DOE's failure to conduct additional evaluations, but deferring to the SRO's conclusion

that the violation did not invalidate the IEP); *T.C. v. N.Y.C. Dep't of Educ.*, No. 15-CV-3477,

2016 WL 1261137, at *8 (S.D.N.Y. Mar. 30, 2016) (same, in context of failure to conduct a

triennial evaluation).

### d.  Cumulative Procedural Errors

Finally, although Plaintiffs do not press this point, the Court considers the cumulative

effect of Defendant's procedural errors in designing S.N.'s IEP.  *See R.E.*, 694 F.3d at 190

("Multiple procedural violations may cumulatively result in the denial of a FAPE even if the

violations considered individually do not." (citation omitted)).  The SRO found that the record

did not show that the procedural violations cumulatively resulted in a denial of a FAPE to S.N.

(SRO Decision 18.)  Specifically, the SRO noted that the IEP was based on numerous evaluative

sources and Plaintiffs do not allege a specific harm from the procedural violations in the form of

a flawed or absent recommendation in the IEP or an effect on their participation in the drafting of

S.N.'s IEP.  (*Id.* at 18–19.)  The Court agrees.

Although the CSE relied on Dr. Greenwell's incorrectly scored report and did not

conduct a classroom observation or obtain the participation of Windward teachers at the August

2015 CSE meeting, these errors did not impede S.N.'s right to a FAPE, significantly impede

Plaintiffs' participation in the decisionmaking process, or deprive S.N. of educational benefits.

*See Winkelman*, 550 U.S. at 525–26.  Indeed, the Court has not identified any of the procedural errors as "serious."  *L.O.*, 822 F.3d at 123.  In any event, this is not a case in which Defendant "displayed a pattern of indifference to the procedural requirements of the IDEA and carelessness in formulating [S.N.'s] IEPs over the period of many years, repeatedly violating its obligations under the statute, which consequently resulted in the deprivation of important educational benefits to which [S.N.] was entitled by law."  *Id.* at 124; *cf. S.Y.*, 210 F. Sup. 3d at 575 ("The [defendant] failed to meet a cascade of statutory deadlines and consistently disregarded the role of parents in the IDEA decisionmaking process.").  Nor do Plaintiffs cite any evidence in the record showing that the CSE did not "meaningfully consider[] [its] proposed placement."  *S.Y.*, 210 F. Supp. 3d at 575.  Additionally, this is not an instance where the CSE "failed to memorialize how it reached the terms of the IEP[]," such that the "cumulative effect" of the procedural errors "was to stifle administrative and judicial review of the CSE's decisionmaking and" any substantive challenge to the IEP.  *Id.* at 576 (internal quotation marks omitted).  Indeed, the procedural violations found to violate the IDEA in the Second Circuit have been either more numerous or more severe than the ones here.  *See id.* (collecting "comparable cases").  Therefore, the Court declines to find that these procedural violations cumulatively violated the IDEA.

### 3.  Substantive Adequacy

Finally, Plaintiffs argue that the August IEP was substantively deficient because the CSE did not have an adequate basis to determine whether S.N. could make progress in a mainstream general education classroom.  (Pls.' Mem. 23–24.)  Construing their Motion generously, they specifically rely on the procedural violations described earlier, as well as the fact that S.N. "regressed" when they attempted to mainstream her at Solomon Schechter and only progressed

at Windward with intensive special education supports.  (*Id.*)  The IHO agreed with Plaintiffs, finding that there was "no discussion" about how S.N. would transition from a full-time specialized program to a general education setting, even though S.N. had previous difficulties with attention, confidence, anxiety, and academic success at Solomon Schechter, and thus the IEP denied her a FAPE.  (IHO Decision 20–21.)  By contrast, the SRO found that the IEP was substantively adequate, analyzing the CSE's basis for the recommended programs in the IEP, the testimony of various District personnel and Dr. Tagliareni, S.N.'s report cards, and Plaintiffs' shifting descriptions of the severity of S.N.'s issues at Solomon Schechter.  (SRO Decision 19–22.)  The Court defers to the thorough, better reasoned decision of the SRO and agrees that the IEP was "reasonably calculated to enable [S.N.] to make progress appropriate in light of [her] circumstances."  *Endrew F.*, 137 S. Ct. at 1000.

As described earlier, the SRO engaged in an exhaustive discussion of the evidence supporting the IEP's recommendation of a resource room and consultant teacher services, plus supplementary aids and services.  The SRO specifically addressed Sh. N.'s concern, voiced at the CSE meeting, that S.N. required a "small group setting" by recounting the testimony of CSE chairperson Snider, the District's special education teacher and June 2015 educational evaluator, the District's school psychologist, and the District's speech language pathologist, all of whom testified that the specific recommendations in the IEP would meet S.N.'s educational needs by providing targeted instruction and skill building that she could practice, with accommodations, in the classroom.  (SRO Decision 19–20.)  Aside from citing Dr. Tagliareni's recommendation, Plaintiffs offer no evidence contradicting this testimony.  (Pls.' Mem. 23–24.)  But, as explained earlier, the Court owes deference to the District, not to Dr. Tagliareni just because she is an "expert."  *See G.W.*, 2013 WL 1286154, at *19 ("The Court is not at liberty to favor [the]

opinion [of] a privately hired expert, over the deference that should appropriately be accorded to the District in matters of educational policy.").  This is particularly true where the SRO explicitly discredited Dr. Tagliareni's recommendation as evincing a "lack of familiarity with the [D]istrict public school programs," because she assumed a general education program would not permit S.N. enough time for word processing while reading—an assumption that was contradicted by the "consistent testimony of the [D]istrict witnesses" that such a modification could be implemented in the classroom and would address S.N.'s specific weaknesses as seen in testing. (SRO Decision 21–22.)  *See T.Y.*, 584 F.3d at 418 (noting that a district court may not "impermissibly ch[o]ose between the views of conflicting experts on a controversial issue of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence" (alteration and internal quotation marks omitted)).

Additionally, the SRO disagreed with the IHO's conclusion that "the CSE had no basis to believe [S.N.] would be able to make progress in a general education environment," pointing to S.N.'s progress "towards grade level expectations in all areas" within language arts subjects and performance "at grade level in three of the four subskills" in math.  (SRO Decision 21.)  The SRO noted S.N.'s identified struggles with phonemic awareness, decoding, and math facts, but the report card stated that S.N.'s "literal and inferential comprehension would also improve" with growth in these skills, something which is reflected in the IEP recommendations and annual goals.  (*Id.*)  Plaintiffs do not identify what about these observations is specific to a specialized environment and could not apply to S.N.'s IEP recommendations in a general classroom. Instead, Plaintiffs argue that S.N. "was unsuccessful and . . . regressed" in a mainstream classroom at Solomon Schechter, (Pls.' Mem. 23), but the SRO discounted that argument by pointing to Sh. N.'s testimony that S.N. was only "pulled out" of class for support due to "mild

issues," as opposed to "major red flags," and was only "falling behind a little bit in the curriculum." (SRO Decision 21.) This testimony, the SRO observed, was much more subdued than Plaintiffs' representations to Dr. Tagliareni that S.N. had "struggled across several academic domains" and had "regressed so much." (*Id.*; *see also* SD Ex. 13 at 89.) Simply put, Plaintiffs cite no evidence that S.N. regressed the only time she was enrolled in a mainstream classroom environment. In fact, the Solomon Schechter report cards, described extensively earlier in this Opinion, show quite the opposite. (*See* SD Ex. 17.)

The SRO also noted that the record contained "discrepant observations" regarding S.N.'s attentiveness and confidence, citing the positive observations in the Solomon Schechter report card and the June 2015 speech language evaluation and the less favorable observations in the June 2013 classroom observation and 2014 psychological evaluation, and therefore concluded that there was less "predictive validity" regarding how S.N. would react to a mainstream classroom environment. (SRO Decision 20–21.) Aside from citing Dr. Tagliareni's ADHD diagnosis, Plaintiffs cite nothing in the record clearly showing that the CSE should have been concerned about transitioning S.N. to a mainstream classroom environment. (Pls.' Mem. 24.) However, it is not clear why an ADHD diagnosis alone renders S.N. incapable of progressing in a mainstream classroom, particularly with the accommodations in the IEP included to maintain her attention. (SD Ex. 4 at 32–33.) *Cf. Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F. Supp. 2d 420, 434 (S.D.N.Y. 2008) (finding IEP inappropriate for child with ADHD because he "did not need to be removed from the community school environment because he was capable of being educated in a school that also educated non-disabled students"). Indeed, the SRO cited the observation on S.N.'s Windward report card that she had "well-developed social skills" and was "an active learner and frequent participant in literary activities."

(SRO Decision 21.)  And, the meeting minutes indicate that "[t]here was discussion about [S.N.'s] anxiety and self[-]concept," and it was "collaboratively" decided that "[i]f she begins to show signs of emotional struggle in school," she will meet with the school psychologist and, if necessary, "counseling will be added to [her] IEP."  (SD Ex. 4 at 25.)

Ultimately, Plaintiffs rely only on the procedural violations and the fact that the CSE reconvened to intensify S.N.'s IEP as evidence that the August 2015 IEP was substantively inadequate.  (Pls.' Mem. 23–24.)  The Court has already addressed those arguments and deferred to the SRO's rejection of them.  Plaintiffs cite no additional cases or regulations requiring a CSE to have a certain modicum of evidence regarding how a child will perform in a mainstream classroom before recommending an IEP that would change the Court's analysis.  Rather, an IEP must be "reasonably calculated to enable [S.N.] to make progress appropriate in light of [her] circumstances."  *Endrew F.*, 137 S. Ct. at 1000.  It need not provide "every special service necessary to maximize [S.N.]'s potential," *Rowley*, 458 U.S. at 199, or "provide[] everything that might be thought desirable by" Plaintiffs, her "loving parents," *S.C.*, 175 F. Supp. 3d at 250. Here, the CSE found, in accordance with the law's "strong preference" to educate children with disabilities "together with their non-disabled peers" and to provide special education services "in the least restrictive setting consistent with a child's needs," *Walczak*, 142 F.3d at 122 (internal quotation marks omitted), that S.N.'s specific difficulties should be addressed in a mainstream classroom environment with accommodations and supplemental resource room time, (SD Ex. 4 at 24–25).  Because this is not a case in which the SRO's decision upholding that view lacked any basis in the record, the Court declines to overturn it.  *Cf. D.M.*, 2016 WL 319859, at *7–8 (finding IEP recommendation substantively deficient where the SRO cited "no evaluative material to support the CSE determination," including the adequacy of a community school as

opposed to small therapeutic school, and ignored the only testimony in the record regarding

school size).[13]

### III. Conclusion[14]

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied. The

Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No 11), enter

judgment for Defendant, and close this case.[15]

SO ORDERED.

DATED:      September **25**, 2018
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[13] Plaintiffs cite *D.M.*, with no pincite, for the proposition that the Court should reject the "conjectural" testimony of the District's witnesses because the basis of their knowledge was clinical testing, not a classroom observation or assessment. (Pls.' Reply 9.) The case does not support this proposition. *See D.M.*, 2016 WL 319859, at *5–8 (holding that the IEP was substantively inadequate, noting that the SRO "cite[d] no evaluative material to support" for the IEP's recommendation of a 12:1:1 class at a community school, whereas the IHO rejected the DOE social worker's testimony in support of that placement because "there was no basis for her belief" and instead credited a psychologist's testimony in support of a smaller class and school).

[14] Because the Court concludes that Defendant did not deny S.N. a FAPE, it need not reach Plaintiffs' argument that they are entitled to reimbursement for the tuition at Windward for the 2015-16 school year. (Pls.' Mem. 25.)

[15] Pursuant to the motion schedule suggested by Defendant—in which Plaintiff would file a summary judgment motion to which Defendant would respond, obviating the need for cross-motions for summary judgment—and to which Plaintiff consented, the denial of Plaintiff's Motion is the equivalent of granting summary judgment to Defendant. (*See* Dkt. Nos. 6–8.)

58